MERCHANTS INDEMNITY CORP, OF NEW YORK, ETC., PLAINTIFF-APPELLANT, v. EDWARD L. EGGLESTON, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued January 22, 1962—Decided March 19, 1962.

116

118

Mr. *Raymond L. Cunneen* argued the cause for plaintiff-appellant (*Mr. Hugh J. O'Gorman,* on the brief).

Mr. *Warren Brody* argued the cause for defendants-respondents (*Messrs. Winetsky & Brody,* attorneys for defendants-respondents Eggleston and Tussel; *Mr. Jack J. Camillo,* attorney for defendant-respondent Krebs).

The opinion of the court was delivered by

WEINTRAUB, C. J. Merchants Indemnity Corporation of New York (herein "Merchants") seeks a judgment declaring it is not obligated under its policy of automobile liability insurance to defend and to pay any judgment which may be obtained in a pending action against its insureds for injuries and death. The trial court found Merchants is so obligated, and the Appellate Division affirmed, 68 *N. J. Super.* 235 (1961). We granted certification, 36 *N. J.* 132 (1961).

The "Family Automobile Policy" was issued to Edward L. Eggleston and initially covered only his Chrysler automobile. Later, by endorsement, coverage was added with respect to a Lincoln owned by his wife, Jean, and she was included as a "named insured." By further endorsement a Thunderbird was substituted for the Lincoln. The Thunderbird, while driven by Jean's brother, Jacob F. Tussel, Jr., was involved in a serious accident, from which emerged the law suit mentioned above.

The Thunderbird was registered in the name of Jean. Merchants asserts Jacob was the true owner, and seeks to be

relieved because of an alleged misrepresentation as to ownership.

The trial court found a material misrepresentation, but held Merchants had waived its right to disclaim by reason of its assumption of the defense of the law suit. The Appellate Division held there was no misrepresentation; that, to prevail, Merchants had to prove concealment with intent to defraud; and, finally, that it need not decide whether Merchants had met that burden since it agreed with the trial court that Merchants had waived its right to deny liability.

## I.

Jacob, age 19, lived with his parents at their home. Jean and her husband lived in a trailer located upon the same parcel of land. The Lincoln was Jean's car. It is conceded that Merchants knew Jacob was to drive the Lincoln. For that reason the endorsement read "This Lincoln is added at Class 2A rates." The classification plan attached to the policy provided:

"CLASS 2A * * * MEANS—the operators of the automobile under 25 years of age are male and are not owners or principal operators of the automobile, or
the owners or principal operators of the automobile under 25 years of age are male and are married."

Jean drove the Lincoln to her work daily while Jacob used it after his working hours. The driving arrangement with respect to the Thunderbird appears to have been precisely the same. The cost of the Thunderbird was $2,700, of which Jacob furnished $700, the balance coming from the parents of Jacob and Jean. Jacob signed the purchase order but the bill of sale went to Jean, who simultaneously disposed of the Lincoln. Jean paid the registration fee and the cost of insurance on the Thunderbird. The agent of Merchants knew Jacob was to drive the Thunderbird, and Class 2A rate, ascribed to the Lincoln, continued as to the substituted car.

The policy begins with a recital that insurance is provided "in reliance upon the statements in the declarations." It closes with the usual provision:

"By acceptance of this policy, the insured named in Item 1 of the declarations agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations * * *."

The "declarations" contain no representation as to ownership.

The provision upon which Merchants relies appears in the endorsement which added the Lincoln and in the endorsement which substituted the Thunderbird. The format of the pertinent provision is significant and hence it is reproduced:

| The Automobile is fully paid for and the Insured is the sole and unconditional owner thereof, except as follows: | | | |
|---|---|---|---|
| | Installment Payments | | Due Date of Final |
| Encumbrances | Number | Amount Each | Installment is |
| $ | | $ | |

Merchants contends that, by accepting the endorsements, the insured adopted the "representation" as to sole ownership contained therein. *Citizens Casualty Co. v. Zambrano Trucking Co., Inc.*, 140 *N. J. Eq.* 378, 380 (*Ch.* 1947), affirmed 141 *N. J. Eq.* 310 (*E. & A.* 1948).

In general, an insured is chargeable with knowledge of the contents of a policy, in the absence of fraud or unconscionable conduct on the part of the carrier. *Heake v. Atlantic Casualty Co.*, 15 *N. J.* 475, 483 (1954). This rule does not reflect a judicial belief that the average purchaser of insurance reads the contract in full or understands all that he reads. Rather the rule rests upon business utility.

A rule which thus rests upon the necessities of the business scene should not be applied when there is no need for it. So, it being thoroughly feasible for the carrier to alert

an assured with respect to changes in a renewal policy, we held it must do so. *Bauman v. Royal Indemnity Co.*, 36 *N. J.* 12 (1961).

█ Beneath all this is the concept that good faith is the essence of insurance contracts, *Gallagher v. New England Mutual Life Ins. Co. of Boston*, 19 *N. J.* 14, 20 (1955), and this means that good faith is required of the insurer as well as of the insured. Good faith demands that the insurer deal with laymen as laymen and not as experts in the subtleties of law and underwriting. The insurer knows what it deems to be material to the risks. It should ask for the information in understandable terms, and if it seeks to rely upon what it incorporates in the contract as a "representation," the language it employs should be revealing to the ordinary man with whom it thus does business. *Henningsen v. Bloomfield Motors, Inc.*, 32 *N. J.* 358, 402 (1960).

█ If we assume Jean read the portion of the endorsements which we reproduced above, the question becomes whether she knew to be false the representation which she "adopted." Since she held record title, an assertion that she was the owner could not be said to be untrue. Whether her ownership was "sole" need be considered only if she represented it to be of that quality. A fair reading of the provision would suggest to the average layman that Merchants was interested only in whether the automobile was subject to encumbrances. The phrase "the sole and unconditional owner" is preceded by "The automobile is fully paid for" and is followed by "except as follows," after which there is space only for the details of encumbrances. It would be too much to expect a layman to lift the word "sole" from that text and to conclude it relates to something distinct from what appears both before and after it. As we read the testimony of Merchants' agent, he too understood the provision to relate solely to encumbrances. Indeed, he must have, since the endorsements list both Jean and her husband as "Insured." The agent knew the husband had no interest in the Thunderbird, and hence if the agent understood the

provision in question related to title, he would not have attributed ownership to both insureds. Since the car was not encumbered, it follows there was no misrepresentation even if the quoted provision be deemed a "representation."

This makes it unnecessary to consider whether a representation as to "sole ownership" would be untrue under the facts of this case. Nonetheless it would be well to comment upon the problem generated by such terminology.

The word "owner" is quite imprecise. It is especially so when applied to an automobile in a State, such as ours, in which title can be transferred only in accordance with statutory provisions. *N. J. S. A.* 39:10–1 *et seq.; National City Bank of New York v. Del Sordo,* 16 *N. J.* 530, 538 (1954) ; *Turpin v. Standard Reliance Ins. Co.,* 169 *Neb.* 233, 99 *N. W. 2d* 26 (*Sup. Ct.* 1959) ; *Kietlinski v. Interstate Transportation Lines,* 3 *Wis. 2d* 451, 88 *N. W. 2d* 739 (*Sup. Ct.* 1958).

There has been much litigation with respect to "ownership" provisions in automobile liability policies. *Norris v. Allstate Insurance Co.,* 34 *N. J.* 437 (1961) ; *Eggerding v. Bicknell,* 20 *N. J.* 106 (1955) ; *Ambrose v. Indemnity Insurance Co. of North America,* 124 *N. J. L.* 438 (*E. & A.* 1940) ; *Hudson Casualty Ins. Co. v. Garfinkel,* 111 *N. J. Eq.* 70 (*E. & A.* 1932) ; *United States Casualty Co. v. Timmerman,* 118 *N. J. Eq.* 563 (*Ch.* 1935) ; *Century Indemnity Co. v. Simon,* 77 *F. Supp.* 221 (*D. N. J.* 1948) ; Annotation, 33 *A. L. R. 2d* (1954), 948; 2 *Richards, Insurance* (*5th ed.* 1952), § 357, *p.* 1177. Insurance carriers must be thoroughly aware of the problem. A statement as to "ownership" may, as here, be but conclusion or opinion upon a factual complex. *Alamo Cas. Co. v. William Reeves & Co.,* 258 *S. W. 2d* 211, 214 (*Tex. Civ. App.* 1953). Representations with respect to matters of opinion certify to the truthfulness with which the opinion is held rather than to the validity of the opinion itself. See *Shapiro v. Metropolitan Life Ins. Co.,* 114 *N. J. Eq.* 378, 381 (*E. & A.* 1933). It is not difficult to frame questions which will elicit such

facts concerning the subject as bear upon the acceptance of the risk. If a carrier is content to ask only for a conclusional statement as to ownership, it should not complain that an untutored insured did not correctly anticipate the view which the highest court of the State might hold. Controversy could be avoided by the use of written applications, plainly worded.

■■ This is not to say that an intentional fraud will succeed. If an automobile is placed in the name of another to cheat a carrier, of course the culprit will fail. But we agree with the Appellate Division that an intent to defraud must be proved. We are not dealing with a representation contained in an application for insurance or set forth in the policy itself, as to which it has been held that rescission may be had for a material untruth even though the insured was innocent of conscious wrong. See *Equitable Life Assurance Society of the United States v. New Horizons, Inc.,* 28 *N. J.* 307 (1958). As we have said, the "representation" in the endorsement was not false. Rather we are speaking of the question whether a failure to come forward with facts which were not solicited should entitle a carrier to rescind. In that setting, rescission may be appropriate prior to loss even though the "mistake" be unilateral, *i. e.,* on the part of the carrier, but after loss the *status quo* cannot be restored. See *Green v. Stone,* 54 *N. J. Eq.* 387, 396 (*E. & A.* 1896). It is then too late for the insured to buy protection. It would be unjust to visit the loss upon an insured whose good faith is unassailable, and to absolve a carrier which could have asked, but did not, for the facts it regards as material. See *Kozlowski v. The Pavonia Fire Ins. Co.,* 116 *N. J. L.* 194, 197 (*E. & A.* 1936); *Zoch v. Metropolitan Life Ins. Co.,* 117 *N. J. L.* 295, 298 (*Sup. Ct.* 1936); *Brighton v. North River Ins. Co.,* 106 *N. J. L.* 10, 12 (*Sup. Ct.* 1929); *Stecker v. American Home Fire Assur. Co.,* 299 *N. Y.* 1, 84 *N. E. 2d* 797 (*Ct. App.* 1949).

Merchants contends there was a fraudulent intent either to obtain insurance at a lower cost or to conceal the driving

record of Jacob. The trial court made no finding upon this subject. On the whole record, a decision could fairly turn upon the demeanor of the witnesses, and hence, if this issue were pivotal, we would remand the matter to the trial court. We need not, however, do so, since we agree with the trial court and the Appellate Division that Merchants' disclaimer of liability is barred by conduct we will now discuss.

## II.

With respect to the issue of "waiver" or "estoppel," the evidence appears in the opinion of the Appellate Division and we need but summarize it.

Within two weeks after the accident of May 12, 1958, Merchants obtained from Jean a statement which revealed the facts relating to ownership upon which Merchants relies. A statement taken from Jacob at about the same time was silent with respect to the underlying facts concerning the purchase of and payment for the car. So far as the record reveals, it was not until September 19 that Merchants took steps to pursue the subject disclosed by Jean in May. On that day, it obtained further statements from Jean and Jacob which essentially squared with Jean's first statement. Throughout all of these statements, and indeed the trial itself, Jean and Jacob maintained their opinion that Jean was nonetheless the "owner" of the car, but there was basic consistency as to the facts themselves.

The damage action against Jacob and Jean was started in October. On November 17, an attorney engaged by Merchants filed an answer. Thereafter, the attorney filed a third-party complaint and participated in discovery proceedings. The first suggestion of disclaimer appeared in the complaint by Merchants for a declaratory judgment in the proceeding now before us. This complaint was filed on January 5, 1959. The summons, which for some undisclosed reason was not issued until February 9, was served on Jean and Jacob on February 25. Thus Merchants first advised the insureds of its denial of liability approximately nine

months after it had received the facts from Jean. We note that Merchants nonetheless continued the defense of the law action, which, as of the date of the hearing of the present cause, was already pretried and awaiting trial.

Merchants contends (A) the institution of the declaratory judgment action was adequate to preserve a right to disclaim; (B) its conduct before and after that suit was started did not constitute a "waiver" or an "estoppel"; and (C) the insureds have "unclean hands" which should bar their assertion of waiver or estoppel.

## A.

It seems to be universally agreed that the defense of an action against the insured is incompatible with a denial of liability unless the carrier has reserved the issue of its liability by appropriate measures. The question is, what measures are appropriate?

The classic mode of reservation is a non-waiver agreement between the insured and the insurer. *Neilson v. American Mutual Liability Ins. Co. of Boston*, 111 *N. J. L.* 345 (*E. & A.* 1933); *Caiola v. Aetna Life Ins. Co.*, 13 *N. J. Misc.* 845, 181 *A.* 524 (*Sup. Ct.* 1935), affirmed 116 *N. J. L.* 381 (*E. & A.* 1936). The agreement may appear in an exchange of letters, as in *Neilson, supra.* The agreement may also be inferred from the insured's failure to reject the carrier's offer to defend with a reservation of rights. *Zisko v. The Travelers Insurance Co.*, 117 *N. J. L.* 366, 368 (*E. & A.* 1937). The rationale is that, by reason of the relation of the parties, the insured is obliged to speak in response to the offer, and hence his silence spells out consent.

Random expressions might be read to mean that a reservation does not depend upon the consent of the insured. See for example, *Ambrose v. Indemnity Insurance Co. of North America*, 124 *N. J. L.* 438, 443–44 (*E. & A.* 1940). We have no case, however, which so holds. The question would arise if an insured rejected an offer to defend under reservation and the carrier nonetheless continued with the

defense. Apparently the question was left open in *Weir v. New Amsterdam Casualty Co.*, 128 *N. J. L.* 214, 218 (*E. & A.* 1942). It was squarely raised and resolved against the carrier in *Goldmann v. Lumber Mutual Casualty Ins. Co. of New York*, 30 *N. J. Super.* 281 (*Cty. Ct.* 1954). Other courts have so held. 7A *Appleman, Insurance Law and Practice* (1961), § 4694, *p.* 546.

We think the holding in *Goldmann* is correct. Control of the defense is vitally connected with the obligation to pay the judgment. Carriers contract for control, and to that end require notice of accident and prompt submission of suit papers. Success, absolute or relative, may depend upon skill in investigation, in negotiations for settlement, and in the conduct of the lawsuit. Just as a carrier would hardly agree to pay a judgment after defense by the insured, so it cannot expect the insured to pay for a judgment when it controlled the litigation. A carrier may be more confident of its handling of claims, but an insured may with equal conviction prefer the individualized attention of his own counsel as against the services furnished by an insurer in the mass-handling of litigation. Personal counsel may seize opportunities to settle which might be ignored or overlooked by a carrier to which the case is just one of a great number. Moreover, whatever his estimate of lawyers in general, a man usually has faith in "my lawyer." This intangible is a valuable right.

For these reasons it would be unfair to permit a carrier to control the defense without the consent of the insured and then leave the judgment for his payment. The policy does not authorize that course. Control of the defense is coupled with the duty to pay. The carrier cannot sever them by its unilateral action. Hence we are satisfied that if a carrier wishes to control the defense and simultaneously reserve a right to dispute liability, it can do so only with the consent of the insured. As we have said, an agreement may be inferred from an insured's failure to reject an offer to defend upon those terms, but to spell out acquiescence

by silence, the letter must fairly inform the insured that the offer may be accepted or rejected.

Here Merchants at no time offered to defend with reservation of rights. Rather it relies wholly upon the fact that it instituted an action for a declaratory judgment. We have no doubt that Merchants was already barred from disclaimer by what had already transpired (as to which we shall presently say more), but we cannot agree that a carrier may claim the right to defend and escape the consequences by filing a suit for a declaration of its duty.

We find no case holding that the filing of complaint for a declaratory judgment will preserve a right to disclaim. The little we have found points the other way. Thus, in *Hawkeye Casualty Co. v. Stoker,* 154 *Neb.* 466, 48 *N. W. 2d* 623 (*Sup. Ct.* 1951), it was held that the institution of such an action constituted a breach of a non-waiver agreement, entitling the insured to take over the defense and to settle the damage suit. In *Schmidt v. National Automobile and Casualty Ins. Co.,* 207 *F. 2d* 301, 38 *A. L. R. 2d* 1142 (8 *Cir.* 1953), the carrier gave notice of intent to defend without prejudice and simultaneously started an action for a declaratory judgment. The insured rejected the offer to defend under reservation, but the carrier nonetheless assumed the defense. The court held the defense of the damage suit operated to bar the disclaimer of liability notwithstanding the declaratory judgment action.

B.

This brings us to the question whether Merchants is barred by its conduct from disputing liability.

The doctrines invoked in this area are "estoppel" and "waiver." Merchants argues that "estoppel" requires detriment or prejudice, and asserts that none is here shown. As to "waiver" Merchants contends the concept requires a voluntary relinquishment of a known right, and says it did not intend to part with its right to be relieved. Hence it urges it is not barred.

Analytically, a distinction should be drawn between (1) cases in which the loss is not within the policy coverage and (2) cases in which the policy does cover but fraud in the inception or a breach of the policy is claimed.

 Where the policy does not cover the loss, it seems inaccurate to speak of a "waiver" since there is nothing to waive. Rather, the relevant thought is "estoppel," and undoubtedly prejudice is an essential ingredient. 3 *Richards, Insurance* (1952), § 430, *p.* 1445. As to estoppel, the decisions in other jurisdictions express varying theses. In some, proof of prejudice seems to be required. Most courts, however, find prejudice is inevitable when the insured is denied the right to maintain complete control of the defense of the damage action. 29A *Am. Jur., Insurance* § 1466, *p.* 579; 5A *Am. Jur., Automobile Insurance* § 133, *p.* 134; 45 *C. J. S., Insurance* § 714, *p.* 689; 7A *Appleman, Insurance Law and Practice* (1962), § 4693, *p.* 535; Annotation, 81 *A. L. R.* (1932), 1326, 1358; Annotation, 38 *A. L. R. 2d* (1954), 1148, 1160. Indeed some courts speak of a "conclusive" presumption of prejudice, doubtless because, since the course cannot be rerun, they believe it futile to attempt to prove or to disprove that the insured would have fared better on his own.

In our State, a number of cases have dealt with estoppel to deny coverage. In *O'Dowd v. United States Fidelity & Guaranty Co.,* 117 *N. J. L.* 444, 451–452 (*E. & A.* 1937), it was flatly said that prejudice is "beside the point." To the same effect is *Goldmann, supra* (30 *N. J. Super.,* at *p.* 286). In other cases prejudice was assumed without any discussion of the subject. See *Horn v. Commonwealth Casualty Co.,* 105 *N. J. L.* 616 (*E. & A.* 1929); *Cook v. Preferred Accident Ins. Co.,* 114 *N. J. L.* 141 (*E. & A.* 1935); *Caiola v. Aetna Life Ins. Co., supra* (13 *N. J. Misc.* 845, affirmed 116 *N. J. L.* 381); *Miller v. Motor Club Insurance Co.,* 117 *N. J. L.* 480 (*E. & A.* 1937); *Serafino v. United States Fidelity & Guaranty Co.,* 122 *N. J. L.* 294 (*Sup. Ct.* 1939).

On the other hand, in *Reliable Newspaper Delivery, Inc. v. Maryland Casualty Co.*, 131 *N. J. L.* 424 (*E. & A.* 1944), where the carrier disclaimed some ten months after the accident and the damage suit was not brought until about one year after the disclaimer, a divided court found there was no evidence of prejudice and hence no estoppel. Perhaps the majority had in mind a distinction between investigation and the defense of a suit. We need not explore that possible line of cleavage, for two reasons. First, Merchants here did undertake to defend the suit. Second, we are not dealing with a lack of policy coverage, but rather with a claim of misrepresentation or fraud in the inception of the coverage, a subject as to which "waiver," rather than "estoppel," is the controlling doctrine. See *United States Casualty Co. v. Melee*, 123 *N. J. Eq.* 256, 258 (*E. & A.* 1938).

In dealing with "waiver" one must keep in mind that the term is used loosely to embrace a number of concepts. 5 *Williston, Contracts* (*3d ed.* 1961), § 679, *p.* 245. These several concepts are distinct and vary in their elements. Hence it would be a mistake to apply a definition, useful for one purpose, to a situation for which it was not intended.

Here, Merchants claims fraud in the inception of the agreement to cover the Thunderbird. The issue is whether Merchants may, with knowledge of the alleged fraud, undertake to perform the contract and then reverse its field, so to speak, and seek to terminate or rescind that contract.

When a contract is obtained by fraud, the law grants the injured party a choice. He may rescind or affirm. If he rescinds, he must return what he received, here the premium for covering the Thunderbird, albeit the amount is quite small. On the other hand, he may choose to affirm the contract, whereupon he retains the consideration he received and has as well a claim for money damages for deceit, which in the circumstances of a liability policy would probably be at best a claim for such additional premium as should have been paid for the coverage. But the defrauded

party must thus elect which course he wishes to follow. He cannot pursue both. If he elects to continue with the contract, the election is final and the contract is affirmed, not because he wants it to be, but because the law makes it so. And if by his conduct he affirms the contract, he cannot be heard to say that he did not "voluntarily" or "intentionally" relinquish his right to call off the deal. *Massachusetts Accident Co. v. Stone,* 127 *N. J. Eq.* 97, 100 (*E. & A.* 1940); *Kazepis v. North Jersey Holding Co.,* 111 *N. J. Eq.* 342 (*E. & A.* 1932); *Ajamian v. Schlanger,* 20 *N. J. Super.* 246, 249 (*App. Div.* 1952); 2 *Restatement, Contracts* (1932), § 484; 5 *Williston, Contracts* (*Rev. ed.* 1937), § 1527, *p.* 4277; 16 *Appleman, Insurance Law & Practice* (1944), § 9254, *p.* 811. Neither consideration nor detriment is necessary to support the finality of the choice. 3 *Richards, Insurance* (1952), § 434, *p.* 1456.

The same principle applies when the carrier learns of a material breach of the contract. It may refuse to perform, but if it does proceed, its election is final and the contract is affirmed. 1 *Restatement, Contracts* (1932), § 309; 3 *Richards, Insurance* (1952), § 433, *p.* 1456; 5 *Williston, Contracts* (*3d ed.* 1961), § 683, *p.* 269, § 684, *p.* 275, § 688, *p.* 300; 5 *Williston, Contracts* (*Rev. ed.* 1937), § 1334, *p.* 3749. See *Kozloski v. Prudential Insurance Co.,* 95 *N. J. L.* 101, 103–04 (*E. & A.* 1921); *Barbera v. John Hancock Mutual Life Ins. Co.,* 127 *N. J. L.* 122 (*Sup. Ct.* 1941).

In short, if a carrier receives information suggesting fraud or breach of contract, it must seek the facts with reasonable diligence, and having acquired them it must within a reasonable period decide whether to continue to perform. What is a reasonable time depends upon the circumstances. In the case of a liability policy, an important circumstance is that the one who is to pay should have an early opportunity to investigate the outstanding claim of the third party. Here Merchants had notice of the facts in May 1958. By September 19 it surely knew the story, but

nonetheless it continued to claim control of the preparation for and the defense of the damage suit. We have no doubt that its conduct constituted an election to affirm the policy. It thus "waived," in the sense here pertinent, its right to disclaim.

C.

Finally, Merchants seeks to invoke the "clean hands" doctrine. It says we should decide whether Jean and Jacob perpetrated an intentional fraud, and if they did, we should hold their misconduct bars assertion of an election by Merchants to continue with the contract. No authority is cited for this unusual proposition. If it were accepted, little or nothing would remain of the rule that a defrauded party must choose between affirmance and rescission.

Merchants misconceives the role of the "clean hands" doctrine. It operates to deny a suitor the special remedies of equity, leaving him to his remedies at law. It does not deny legal rights, or foreclose a defense by a defendant brought into equity. See *Manufacturers' Finance Co. v. McKey*, 294 *U. S.* 442, 55 *S. Ct.* 444, 79 *L. Ed.* 982 (1935).

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.