FISHER, P.J.A.D.
*137 We consider whether a third party may take advantage of an estoppel doctrine-first recognized in Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 179 A.2d 505 (1962) -that has been found to apply when an insurer, while reserving its rights or *138 otherwise declining to provide coverage, fails to clearly request its insured's consent to the insurer's control of the defense. Unlike the trial judge, we cannot conclude the insurer here should be estopped from denying coverage because there is no clear evidence that the ostensibly defunct insured changed its position to its detriment even if the insurer assumed the defense without consent. We also reject the argument that Eggleston permits avoidance of estoppel only if the insurer uses certain magic words in communicating with its insured; the insurer's disclaiming letter here could reasonably be interpreted as conveying an offer rather than a unilateral declaration of a right to control the defense. For these and the other reasons that follow, we reverse the summary judgment entered in favor of the parties seeking estoppel-the victim of the insured's alleged negligence and its property-damage insurer-and also affirm the denial of the insurer's motion for summary judgment. *519 We briefly outline the circumstances that inspired this declaratory judgment action and consider those circumstances in the light most favorable to plaintiff Northfield Insurance Company, the opponent of the summary judgment motion filed by defendant Mt. Hawley Insurance Company. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
In June 2012, Empress Properties, Inc. hired CDA Roofing Consultants, LLC, to perform roof installation work on the Empress Hotel in Asbury Park; CDA subcontracted some of the necessary labor to Labrusciano Construction, LLC. The work was deemed completed in July 2012.
The Empress Hotel is located on Asbury Avenue, less than 1000 feet from the Atlantic Ocean. Superstorm Sandy made landfall on the Jersey Shore on October 29, 2012, causing roof damage, which caused further water damage to the Hotel's interior. CDA was insured by Northfield when the roof-installation work was performed as well as when the storm hit.
The record suggests that CDA did not notify Northfield of the claim asserted by Empress Properties and Mt. Hawley, Empress's *139 insurer. Instead, by letter dated November 28, 2012, Mt. Hawley's attorney advised Northfield of the circumstances and its potential claim against CDA for the resulting damages. On January 24, 2013, Northfield wrote to Mt. Hawley's attorney to deny the claim based on its investigation and the view of Northfield's expert that the damage was caused by Sandy's winds, not CDA's negligence. Five days later, Northfield wrote to CDA to advise of its investigation of Mt. Hawley's claim and quoted from numerous policy provisions and exclusions to support its position-based on an "assessment of the information presently available"-that coverage for Mt. Hawley's claim was excluded; Northfield did state, however, that while one provision excluded any "damage to the roof that occurred after [CDA's] work was completed," that exclusion would not apply "if the damaged work or the work out of which the damage arises was performed on [CDA's] behalf by a subcontractor." Northfield acknowledged that "[r]esulting water damage to the rooms inside the hotel" would be covered "to the extent [CDA] is legally responsible for these damages." Northfield also asserted that in expressing these views it was not admitting or waiving any available coverage defense or limitation, that it was reserving any rights it might possess "in connection with these matters whether stated or not in this letter," and that it was reserving "the right to modify its coverage position at any time upon receipt of additional information." And the letter urged CDA, if sued, to "promptly" forward any complaint for Northfield's "consideration."
More than a year later-on March 17, 2015-Empress and Mt. Hawley filed a complaint against CDA and Labrusciano. Among other things, Empress and Mt. Hawley claimed: that cracks developed in the ceilings of several rooms on the hotel's top floor in early October 2012; that CDA was immediately notified; that CDA denied responsibility and took no action; that emergency repair work was undertaken; that the roof collapsed on October 22, 2012-a week before Sandy's landfall; and that the roof collapse left the top floor exposed to the elements that Sandy soon provided. Mt. Hawley and Empress asserted that the pre-Sandy *140 roof problems were caused by the negligence of either CDA or Labrusciano or both.
On June 9, 2015, Northfield wrote to CDA to advise that it was "disclaiming any obligation to indemnify." Northfield explained, over the course of a number of pages of its letter, the reasons for its actions, including: (1) CDA's failure to *520 timely advise of the claim, noting that CDA was served with the summons and complaint on April 26, 2015, but Northfield was not advised until Mt. Hawley gave it notice on June 4, 2015; (2) some of the damages claimed in the suit included replacing the roof CDA was contracted to install and the policy excluded "property damage" to "[CDA's] product" or "[CDA's] work"; and (3) another exclusion precluded coverage because there was no evidence that "Labrusciano agree[d] to defend, indemnify and hold [CDA] and the project owner harmless from all liability arising out of that work" and no evidence that Labrusciano "agree[d] to add [CDA] and the project owner as an additional insured on Labrusciano's policy."
But, while denying an obligation to indemnify, Northfield volunteered to provide a defense; that is, Northfield stated that
[n]otwithstanding [a denial of coverage, it was] willing to provide [CDA] with a courtesy defense for this lawsuit.
Northfield also identified an attorney to whom the defense had been tendered, requested CDA's "complete cooperation" with that attorney, and expressed that, while "providing [CDA] with a defense for the entire lawsuit ...[,] [Northfield is] further reserving [its] rights to withdraw from the defense of this action at any time and seek reimbursement of defense costs [for] any [defended but uncovered] causes of action." Northfield lastly repeated what its earlier letter stated: that nothing expressed should be "construed as an admission of liability or as a waiver of any coverage defense or limitation that is available to Northfield"; that Northfield "reserves any legal and policy defenses it may have in connection with these matters whether stated or not in this letter"; and that Northfield "reserves the right to modify its *141 coverage position at any time upon receipt of additional information."
Six months later, Northfield commenced this suit against Mt. Hawley, Empress, CDA, and Labrusciano, seeking a declaration that it had no obligation to defend or indemnify CDA in Mt. Hawley and Empress's suit against CDA.[1] That underlying action was stayed pending resolution of this declaratory judgment action.
Before the completion of discovery,[2] Mt. Hawley and Empress (hereafter collectively "Mt. Hawley") moved for summary judgment, arguing that Northfield should be estopped from denying coverage for the claim against CDA in the underlying action; Northfield cross-moved for summary judgment, arguing that Mt. Hawley's estoppel argument lacked merit and that, as a matter of law, its policy did not cover the claims asserted against CDA. The motion judge, by way of a written decision, granted Mt. Hawley's motion by determining that Northfield's actions did not comport with Eggleston because Northfield failed to properly seek CDA's consent to its control of the defense and, because of this asserted failure, Northfield could not rightly disclaim coverage for CDA in the underlying action. The judge also denied Northfield's summary judgment motion, finding questions of fact about the policy's coverage.
Northfield appeals,[3] arguing: the doctrine of estoppel is inapplicable because *521 Eggleston's"right to reject" applies to reservations *142 of rights, not denials of coverage; CDA was not prejudiced and, consequently, there was no ground upon which to fix an estoppel; Mt. Hawley lacked standing to assert the estoppel doctrine; and the Northfield policy does not cover the claims asserted against CDA in the underlying action. We reverse because: (1) we do not view the wording of Northfield's disclaimer as inconsistent, as a matter of law, with Eggleston's holding; (2) the estoppel doctrine has no application absent a showing of prejudice to or detrimental reliance by the insured and the facts are presently too uncertain to make such a determination; and (3) Mt. Hawley's standing to claim application of the estoppel defense is also plagued by an uncertain context. We also conclude that (4) the motion judge correctly denied Northfield's cross-motion for summary judgment.
I
We briefly discuss the circumstances in Eggleston in order to provide context for its holding and its purported application here. In Eggleston, with information concerning the insured's alleged misrepresentation of ownership of a vehicle that was involved in the underlying auto accident, the insurer assumed the defense of an injured party's suit for damages and then commenced a separate action against the insured seeking a declaration that it had no obligation to defend or indemnify. 37 N.J. at 125, 179 A.2d 505. In writing for the Court, Chief Justice Weintraub explained why it is that "[c]ontrol of the defense is vitally connected with the obligation to pay the judgment," and, consequently, that "it would be unfair to permit a carrier to control the defense without the consent of the insured and then leave the judgment for his payment." Id. at 127, 179 A.2d 505. These principles gave rise to the Court's holding, which forms the centerpiece of Mt. Hawley's position: "if a carrier wishes to control the defense and *143 simultaneously reserve a right to dispute liability, it can do so only with the consent of the insured." Ibid. Without the insured's consent or circumstances that suggest the insured acquiesced in the insurer's control of the defense, an insurer will be estopped from later disclaiming coverage. Griggs v. Bertram, 88 N.J. 347, 356, 443 A.2d 163 (1982) ; Eggleston, 37 N.J. at 127-29, 179 A.2d 505 ; Sneed v. Concord Ins. Co., 98 N.J. Super. 306, 320, 237 A.2d 289 (App. Div. 1967).
But, contrary to the thrust of Mt. Hawley's argument, the Eggleston Court did not impose only one way in which the insured's rights upon a disclaimer or coverage denial may be observed. The insurer of course may plainly ask for consent or advise the insured it has a right to reject the defense, but the insured's rights may be observed in other ways. For example, the Eggleston Court recognized that "an agreement may be inferred from an insured's failure to reject an offer to defend upon those terms," although it also recognized that "to spell out acquiescence by silence, the letter must fairly inform the insured that the offer may be accepted or rejected." 37 N.J. at 127-28, 179 A.2d 505. Obviously, the approach that gives rise to the greatest certainty about the parties' stances in the underlying matter would *522 start with the insurer's clear expression that, if the insured consented, it would provide a defense subject to its reservation of rights and future determination of its obligations, or lack thereof.
The insured's consent to the insurer's control of the defense in such circumstances may, however, be derived through other means. Here, as mentioned, Northfield wrote to CDA-on learning from Mt. Hawley (not from CDA) of the underlying suit-to explain how policy provisions excluded coverage; Northfield also stated in the first paragraph of its seven-page letter that it was "disclaiming any obligation to indemnify" but was "willing to provide ... a courtesy defense" (emphasis added). Toward the end of its letter, Northfield identified the attorneys it had retained to defend CDA and urged CDA's "full cooperation," but those statements should be understood in light of its previously-stated "willing[ness *144 ]" to provide "a courtesy defense." Without running to dictionary definitions for an interpretation of these words, it is appropriate to recall that we are reviewing a summary judgment based on estoppel because the judge determined, as a matter of law, that Northfield failed to obtain CDA's consent to or its acquiescence in Northfield's control of CDA's defense in the underlying suit. Northfield's expression of a "willingness" to provide "a courtesy defense"[4] at least generates doubt whether CDA's failure to decline that ostensible favor justifies a finding that CDA acquiesced in Northfield's control of the defense of the underlying action. That uncertainty precluded a grant of summary judgment in favor of Mt. Hawley, which purports to speak for CDA on this question, because Northfield was entitled to have the judge view the evidential materials "in the light most favorable" to Northfield, the non-moving party. Brill, 142 N.J. at 540, 666 A.2d 146. In our view-and we apply the same standard that bound the motion judge, Townsend v. Pierre, 221 N.J. 36, 59, 110 A.3d 52 (2015) -the statement that a "courtesy defense" would be provided might plausibly be interpreted as an offer of a defense, and not as the insurer's insistence on controlling the defense. And, if interpreted as an offer, CDA's following silence could be interpreted as acquiescence in Northfield's control of the defense; such a circumstance would not offend Eggleston or its progeny.[5] *523 *145 For these reasons, the judge's application of the doctrine of estoppel was precipitous and cannot stand.
II
We also find factual uncertainties that preclude the application, by way of summary judgment, of estoppel principles even if CDA's consent was not obtained or assumed through its silence in response to the disclaimer letter. We reject Mt. Hawley's argument and the motion judge's determination that estoppel must always follow an insurer's failure to fairly seek consent. Indeed, Eggleston hardly supports such a view because waiver instead of estoppel was found implicated there. 37 N.J. at 130, 179 A.2d 505. Eggleston in no way suggests that estoppel immediately attaches when an insurer, while reserving its rights or declining coverage, assumes control of the defense without first obtaining the insured's consent. On the other hand, we recognize that Sneed would appear to have drawn such a conclusion; in fact, in Sneed, the panel held that " Eggleston adumbrates" the conclusion that estoppel will automatically follow and "[p]rejudice to the insured will be assumed." 98 N.J. Super. at 320, 237 A.2d 289. We do not agree with that blanket statement.
Estoppel is a doctrine applied at law and in equity for the purpose of precluding a party "from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449, 217 A.2d 617 (1966) (quoting 3 Pomeroy's Equity Jurisprudence § 804 (5th ed. 1941) ); see also Segal v. Lynch, 211 N.J. 230, 254, 48 A.3d 328 (2012) ;
*146 Carlsen v. Masters, Mates & Pilots Pension Plan Tr., 80 N.J. 334, 339, 403 A.2d 880 (1979) ; Morgan v. Raymours Furniture Co., Inc., 443 N.J. Super. 338, 342, 128 A.3d 1127 (App. Div. 2016). There are a number of reasons why the doctrine might not apply even if Northfield was less than clear in communicating with CDA and even if Northfield failed to adequately obtain CDA's consent either expressly or by an assumption of its acquiescence through silence. Bearing in mind that we are reviewing a summary judgment, we find too many factual uncertainties to allow for the application of estoppel as a matter of law.
First, it has not been shown that CDA relied on what Northfield wrote and changed its position to its detriment. The factual record suggests that CDA was defunct when Northfield declined coverage and assumed CDA's defense. Consequently, one might ask what CDA would have otherwise done if it had rejected Northfield's "courtesy defense." It certainly did not appear to be prepared to defend itself; no doubt CDA would have defaulted if Northfield had not provided a defense, just as CDA defaulted in this declaratory judgment action. So, it is fair to conclude-at least for summary judgment purposes-that CDA did not adjust its conduct one way or another when advised by Northfield that it would provide a "courtesy defense." In short, the evidence is inconclusive if not lacking at this time as to whether CDA detrimentally relied.
Second, in the same vein, there is no evidence to suggest Northfield's actions-even if a fact finder could conclude Northfield unilaterally seized CDA's defense-were committed with an "intention or expectation that [they would] be acted upon by the other party." Carlsen, 80 N.J. at 339, 403 A.2d 880 ; Clark v. Judge, 84 N.J. Super. 35, 54, 200 A.2d 801 (Ch. Div. 1964), aff'd, 44 N.J. 550, 210 A.2d 415 (1965). The "other party"-CDA-wasn't "acting" at *524 all; it was moribund if not completely defunct at the time. Whatever Northfield did or would do in defense of the underlying action[6] was not likely to cause injury to CDA regardless *147 of the outcome. With CDA's demise, the only party truly interested in defending the underlying action was Northfield itself; if successful, that success will redound to both its benefit and CDA's benefit as well. If it fails, but the resulting judgment in the underlying action falls within its insuring provisions without also falling within an exclusion, CDA still benefits. It is only if the result of the underlying action gives rise to CDA's liability that is in whole or in part uncovered by Northfield's policy will CDA's interests be impacted; but if CDA is defunct that result too would appear to CDA to be of no concern. Consequently, the existing record supports a determination that Northfield's interests are largely aligned with CDA's, and not at odds, as is presupposed in most instances when a disclaiming insurer assumes a defense without consent. In this way, our case greatly differs from Sneed and reveals that its blackletter mandate may not be as all-encompassing as asserted by Mt. Hawley.
We thus reject the motion judge's assumption that Northfield's failure to seek CDA's consent requires that it be estopped from declining coverage in the underlying claim. For this reason as well, the judge erred in granting Mt. Hawley's motion for summary judgment.
III
We next consider whether Mt. Hawley has standing to raise this estoppel argument. Although the motion judge never expressed a view on this point, the fact that he granted summary judgment in Mt. Hawley's favor leads to an assumption that he found Mt. Hawley had standing to pursue its estoppel theory even though *148 that concept originates from the Northfield/CDA relationship to which Mt. Hawley was not privy.
The general rule, as reiterated recently in Ross v. Lowitz, 222 N.J. 494, 512, 120 A.3d 178 (2015) (quoting Gen. Acc. Ins. Co. v. N.Y. Marine & Gen. Ins. Co., 320 N.J. Super. 546, 553-54, 727 A.2d 1050 (App. Div. 1999) ), is that "a stranger to an insurance policy has no right to recover the policy proceeds." In Ross, the Court held that, absent an assignment of rights or a contrary intent at the contract's formation, a third party injured by an insured's acts or omissions has no standing to pursue a claim based on the bad faith of the insurer in responding to the claim. Id. at 513-14, 120 A.3d 178. To be sure, there is no evidence of an assignment from CDA to Mt. Hawley of the former's rights in the Northfield policy. But, the intentions that may be attributed to a general liability policy are not so rigidly clear when considering the interests of a victim of the insured's acts or omissions. This is particularly true when the insured has become defunct or insolvent, as suggested by the record here.
In fact, standing is closely linked to the very reason for obtaining liability insurance. In early cases, when the obligation of an insurer to indemnify was viewed in its purest sense, even an insured could not *525 recover against its insurer without first discharging its liability to the victim. See, e.g., Hebojoff v. Globe Indem. Co., 35 Cal.App. 390, 169 P. 1048 (1917). Because of that narrow approach, the insolvency of an insured-as may be the case here-would prevent a victim not only from recovering from the insured but also from its insurer. Robert E. Keeton, Basic Text on Insurance Law § 4.8(b) at 233 (1971). Consequently, insurance policies-usually by legislative direction-later addressed insolvency and allow a victim to directly pursue an insurer once the claim is successfully adjudicated and without a need for the insured's cooperation. Id. at 233-34.[7] In that sense, a victim of *149 an insured's act or omission may be viewed as a third-party beneficiary of the insurance contract. Id. at 234; see also Holmes' Appleman on Insurance 2d, Vol. 22, § 142.1[D] at 484 (2003).
Although not mentioned in the parties' submissions, Northfield's policy contains a provision that permits "[a] person or organization" to "sue [Northfield] to recover an agreed settlement or on a final judgment against an insured"; the provision further purports to limit Northfield's liability in such a suit to the terms of the policy itself. This provision must be viewed as allowing standing-or exhibiting an intent to confer third-party beneficiary status in some degree-to those who incur losses as a result of the liability of an insured when that liability is covered by the policy terms.
So viewed, the standing dispute provokes additional questions. Even if properly viewed as the policy's third-party beneficiary, may the alleged victim pursue relief against the insurer based on concepts that seem linked only to the insurer/insured relationship? For example, may the victim dispute the insurer's contention that the insured did not give adequate notice of the claim? Or does the victim only have standing to attempt to prove that the insured was liable and that the nature of its acts or omissions fit within the policy's insuring provisions without also falling within an exclusion? We recognize that Ross may very well bar Mt. Hawley from contending that Northfield may not assert its untimely receipt of notice of the claim, because Ross barred the alleged victims there from asserting the insurer's bad faith in responding to the claim against the insured. But we see nothing in Ross that would suggest that the basic policy provision that allows a party who has obtained a judgment against the insured to sue the insurer for *150 relief does not also confer third-party beneficiary status on that party to the extent necessary to pursue complete relief. The Court in fact has recognized that such a victim has an interest to some extent in a liability policy and standing to some degree to be heard as to its applicability to the victim's claim. See Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 397, 267 A.2d 7 (1970).
The standing question has received only cursory attention in the parties' submissions[8] and was not discussed in the *526 motion judge's written decision. Rather than get out over our skis on this question, we leave the matter for further development in the trial court following today's reversal of the summary judgment under review.
IV
In its fourth argument, Northfield contends that it is not obligated to indemnify CDA because CDA failed to require that Labrusciano maintain general liability insurance with coverage equal to or greater than the coverage provided under the Northfield policy and, also, that CDA failed to secure from Labrusciano that it would be named as an additional insured on Labrusciano's policy. The motion judge denied that motion, finding a lack of clarity about both the relationship between CDA and Labrusciano, and the terms of their agreement. We find insufficient merit in Northfield's arguments on this point to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).
For all these reasons, we reverse that part of the order under review that granted Mt. Hawley and Empress's motion for summary judgment, and we affirm that part of the order that denied Northfield's cross-motion for summary judgment. The matter is remanded for further proceedings.
*151 Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.

We will refer to the action filed by Mt. Hawley and Empress as "the underlying action" and the action at hand as "the declaratory judgment action."

It appears that Northfield served interrogatories on Mt. Hawley and Empress; only Mt. Hawley answered, but not, in Northland's view, responsively.

The notice of appeal asserts that all issues as to all parties were adjudicated in the trial court, but the order under review only granted relief to Mt. Hawley and it denied Northfield's cross-motion for summary judgment; default was entered against CDA and Labrusciano but it is unclear whether default judgments against those parties were ever entered. In other words, it is not clear whether all issues as to all parties were finally resolved in the trial court. To the extent necessary we grant leave to appeal out of time to consider the issues raised in this appeal.

These words are certainly suggestive of an interpretation that Northfield was only acting voluntarily or merely bestowing on CDA a favor rather than imposing its will. We're not so naïve, however, to assume Northfield was purely acting out of the goodness of its heart for the benefit of its defunct insured; by disclaiming, Northfield placed itself at risk that Mt. Hawley might obtain a default judgment against CDA that might be interpreted in this declaratory judgment action as falling within its insuring provisions without falling within an exclusion. But the words Northfield utilized cannot be plausibly interpreted as only conveying a fiat that it would control the defense and, for that reason, the judge prematurely granted summary judgment by interpreting Northfield's communication in just that way.

In speaking for this court in Sneed, Judge Conford recognized the question turns on whether the insurer has "offered" a defense or whether it has "unilateral[ly] declar[ed] ... its intention to control" the investigation and defense. 98 N.J. Super. at 314, 237 A.2d 289. As we have demonstrated, and as Eggleston recognized, an offer need not arise solely from expressions like: "we are offering a defense of the claimant's suit but, because we are disclaiming or reserving our rights to disclaim, you, the insured, may reject." An offer could also plausibly be gleaned from an insurer's expression of a willingness to provide a courtesy defense. Whether that was what was or could have been fairly understood by CDA upon receipt of Northfield's letter is for the factfinder to determine.

It appears that nothing has occurred in the underlying action that might be equated with Caesar's crossing of the Rubicon. The record on appeal reveals only that the attorneys retained by Northfield to defend CDA filed a responsive pleading and, not long after, that action was stayed "pending resolution" of this declaratory judgment action. The steps taken in defense of CDA have not been alleged or shown to be so irredeemable that the only fair solution would be the imposition of an estoppel of Northfield-at least when considering that question at the summary judgment stage.

Such clauses would appear to have been compelled by legislative mandate for nearly 100 years. See N.J.S.A. 17:28-2 (declaring that no insurance policy "against loss or damage ... shall be issued or delivered in this state" absent a provision that also permits "the injured person, or his personal representative" to maintain an action when the insured is "insolven[t] or bankrupt[ ]"). At least to this extent, our Legislature has recognized the injured party is a third-party beneficiary of the insurance policy and has standing to sue. Whether these circumstances exist here remains uncertain in light of the undeveloped record regarding CDA's status.

The parties' debate about standing appears to largely center on the Declaratory Judgment Act, N.J.S.A. 2A:16-50 to -62. That Act, however, confers no substantive rights; it only expands what might constitute a judiciable controversy.