ELIZABETH WYMOND CLARK, INDIVIDUALLY AND AS SURVIVING TRUSTEE UNDER TRUST AGREEMENT DATED MARCH 6, 1935, PLAINTIFF, v. ELIZABETH McCLASKEY JUDGE, INDIVIDUALLY AND AS EXECUTRIX OF THE LAST WILL AND TESTAMENT OF JOHN F. JUDGE, DECEASED; ANNETTE M. JUDGE, INDIVIDUALLY AND AS EXECUTRIX OF THE LAST WILL AND TESTAMENT OF GILBERT W. JUDGE, DECEASED; LOUISA J. H. JUDGE AND AUGUSTA G. C. JUDGE, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided May 25, 1964.

36

39

*Messrs. Riker, Danzig, Scherer & Brown,* attorneys for plaintiff (*Mr. Everett M. Scherer,* of counsel).

*Mr. Pearce R. Franklin,* attorney for defendant Elizabeth McClaskey Judge, individually (*Mr. Harmon Duncombe,* of the New York Bar, of counsel).

*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys for defendant Annette M. Judge, individually and as executrix (*Mr. Marshall Crowley,* of counsel).

*Messrs. Shanley & Fisher,* guardian *ad litem* for Augusta G. C. Judge and Louisa J. H. Judge, infants (*Mr. Bernard M. Shanley,* of counsel).

PASHMAN, J. S. C. This action is brought by the settlor of an *inter vivos* trust (1) to construe the same; (2) to review an attempted appointment of a successor trustee; and (3) to determine the validity of certain amendments to said trust as well as the validity of a purported renunciation of a life estate by plaintiff Elizabeth Wymond Clark (hereafter "plaintiff" or "settlor"). Plaintiff also seeks certain injunctive relief against and an accounting from defendant Elizabeth McClaskey Judge (hereafter Elizabeth Judge). Elizabeth Judge has counterclaimed for an accounting and for declaratory relief concerning the alleged renunciation by plaintiff as well as certain amendments to the trust. The infant defendants have also cross-claimed against defendant Elizabeth Judge for a reassignment to the trust of certain oil royalties held by her.

Plaintiff and defendant Annette Judge join in this prayer for relief.

On March 6, 1935 plaintiff, as settlor, executed and delivered a trust indenture under the terms of which she turned over to herself and two other individuals, as trustees, cash and securities valued at $750,000. The other trustees were Paul Armitage (plaintiff's attorney) and one Harold Clark (no relative). Plaintiff, a widow, had two sons, John and Gilbert, by a previous marriage. John Judge died a resident of Texas in April 1962. No children survived but he left a widow, defendant Elizabeth Judge. The latter remarried on May 24, 1962, but was recently divorced. Gilbert Judge died a resident of New York on March 20, 1959 and was survived by a widow, defendant Annette Judge, and two children of his prior marriage, defendants Louisa Judge (born in 1947) and Augusta Judge (born in 1949), who are represented by a guardian *ad litem*.

The 1935 agreement provided in article First for payments of income to John and Gilbert Judge of $5,000 per year for five years, and $100 a year thereafter for life. The remainder of the annual income was to be paid to the settlor.

Article Second provided as follows:

"SECOND: Upon the death of the Settlor the principal of the said trust shall be paid over by the said trustees to those persons who would be and who would answer the description of her next of kin at the time of her death and be entitled to her property, as if she had died intestate without leaving any last will and testament; but the proportionate amounts to be received by the said next of kin may be altered, changed or modified, or left in trust by the last will and testament of the Settlor."

After providing how the *corpus* might be invested, the settlor granted the following powers in article Sixth:

"SIXTH: The said Trustees (the Grantees and the Settlor) shall have the following additional powers:

(a) To advance and pay over to the Settlor any part of the corpus of the trust, but not to exceed in any one year 20% thereof, said 20% to be figured upon the market value of the securities or investments of

the trust, plus any securities or investments, not having a market value, at the amount fixed by a majority of the Trustees, whose decision shall be final; but no such amount shall be advanced except with the written consent of the Settlor and one of the other parties, either John Judge or Gilbert Judge; but said power shall not exist after five years from the date hereof.

(b) To make deposits in any banks, trust companies or financial institutions, domestic or foreign, and draw drafts or checks thereon, upon the signatures of two of the Trustees, one of whom shall be the Settlor, or any attorney of the Settlor authorized by her in writing to sign.

(c) To deposit securities in a safe deposit box, access to the same to be given to two Trustees, one of whom shall be the Settlor, or any attorney of the Settlor authorized by her in writing to act for her.

(d) The Trustees may pay or advance to the executrix or representatives of the Estate of Charles W. Clark any sum or sums that may be necessary or required to pay the debts of said estate, and to take the same out of principal.

(h) The Trustees shall have power to obtain legal advice or accounting assistance in connection with their performance of the trust, but the selection of such legal advisers or accountants shall be approved by the Settlor."

## Articles Ninth, Tenth and Eleventh provided as follows:

"NINTH: Either or both of the Grantees may be removed as Trustees by the Settlor, at any time after two years from the date hereof, and new trustees appointed, but only with the written consent of the said John Judge or Gilbert Judge, or both. In the event of such removal the Trustees so removed shall be paid out of the corpus of the estate the sum of Two thousand five hundred Dollars ($2,500) plus Two hundred and fifty Dollars ($250) for each year in excess of two years that he has acted.

In the event of the death or resignation or incapacity of either or both of said Grantees as Trustees, at any time, a new Trustee shall be appointed in place thereof by the Settlor, the same to have the written approval of the said John Judge or Gilbert Judge, or both.

TENTH: The Settlor, at any time within four years and ten months from the date hereof, acting in conjunction with and with the written consent of either John Judge or Gilbert Judge, shall have the right to amend this instrument and the trust hereby created, in any respect whatsoever and as often as desired, and also to revoke the same in whole or in part by an instrument signed by the Settlor and either said John Judge or Gilbert Judge, and delivered to the Trustees. But no amendment shall be made in this instrument which shall in any way increase the obligations of the Trustees hereunder or change their rights or duties without their written consent.

ELEVENTH: The situs of this trust shall be deemed the State of New Jersey, and all the securities shall be deposited in the State of New Jersey and the deposit or bank account kept therein; but the Settlor and either one of the Grantees, at any time, may by written agreement change or alter the situs of the trust to any other state, and change or remove the place of deposit of securities or bank account to any other state, territory or country."

The period of four years and ten months from the execution of the original trust indenture expired on January 6, 1940. Six amendments were executed during this period. These amendments basically related to changes in the allocation of income between the settlor and her two sons. The evidence indicates that the settlor signed the amendments upon the advice of her counsel, who desired to effectuate certain tax savings. On December 27, 1940 (which was after the four year and ten month period referred to in article Tenth of the 1935 agreement) an agreement was executed by plaintiff and Messrs. Armitage and Clark which purported to amend and partially revoke the 1935 trust agreement. Among other provisions, John and Gilbert were given life incomes of $7,500 per year and the original agreement was amended to allow amendment or revocation, in whole or in part, by an instrument signed by plaintiff and both John and Gilbert or the survivor of them. Subsequent amendments, dealing primarily with changes in income, were made between December 27, 1940 and October 22, 1946. An amendment on the latter date purported to restate substantially the terms of the trust and to change drastically the distribution of *corpus* upon the death of the settlor. Of particular relevancy is article Second (c) which provided:

"(c) Upon the death of both of my sons, JOHN JUDGE and GILBERT JUDGE dying before the Settlor, then the whole income of the Trust shall be paid over to the Settlor during her life, and upon her death the Trust shall cease and determine, and the principal of the Trust with all accumulations shall be paid over by the said Trustees (1) to those persons or bodies corporate designated by both of my sons in a written instrument executed according to a deed, under the Laws of the State of New York, but my sons may from time to time jointly cancel any such written designation, and such designa-

tion is to be filed with the Trustees; or, (2) on both of my sons' failure to execute such a designation, to those persons who would be and who would answer the description of the next of kin of my sons dying before me at the date of their respective deaths, as if they had each died intestate without leaving a Last Will and Testament."

The original trust agreement provided that upon the death of the settlor the trust *corpus* was to be paid to *her* next of kin in accordance with the provision of article Second. However, the contingency in article Second (c)(2) occurred whereby the settlor survived her sons, who failed to designate persons to take after the death of the settlor. By reason of said failure, the persons to take upon the death of the settlor were those persons who would be and who would answer the description of the next of kin of the sons at the date of their deaths as if each had died intestate. If the original trust is sustained and the 1940 and 1946 amendments are found invalid, the entire *corpus* would go to the infant defendants by virtue of all of the possibly applicable statutes. See *N. J. S.* 3A:4–2 and *N. Y. Decedents Estate Law,* § 83. If the 1940 and 1946 amendments are sustained, the *corpus* would be divided among the defendants Elizabeth Judge, Annette Judge and the infant defendants.

Subsequent amendments were made up to and including February 6, 1959. However, they largely related to changes in income and did not purport to modify article 2(c)(1) of the 1946 agreement.

Over the years other trustees were substituted for Mr. Clark and Mr. Armitage. By January 17, 1951 plaintiff, John and Gilbert were the trustees. Upon Gilbert's death in 1959, plaintiff and John acted as the only trustees. By a document dated April 8, 1960 John purportedly appointed his wife, defendant Elizabeth Judge, as trustee in Gilbert's place, but she never attempted to exercise any powers as trustee until on or after April 1962.

The remaining issues concern (1) a purported renunciation and relinquishment of plaintiff's life estate by virtue of a written document signed by her in 1956, and (2) the owner-

ship of certain overriding oil royalty interests in Louisiana which were purchased by the trust in 1939 for $10,650. Plaintiff, defendant Annette Judge and the infant defendants all contend that a purported transfer of the oil royalties to defendant Elizabeth Judge by her husband was void because the royalties were the property of the trust. These parties also seek an accounting from defendant Elizabeth Judge for any royalty income received by her from November 1961.

Plaintiff also attacks the validity of a document dated January 17, 1962, whereby John Judge purported to assign to defendant Elizabeth Judge his interest in trust *corpus* or income.

## I.

### THE DOCTRINE OF WORTHIER TITLE

The initial issue which must be determined is whether the trust instrument created a reversion in the settlor so that she could amend or revoke the trust beyond the four year and ten month period, or whether a remainder was created rendering the trust irrevocable and not amendable after the four year and ten month period except with the consent of all the beneficiaries.

As framed, the issue resolves itself into a question of whether the trust falls within the strictures of what is commonly known as the Doctrine of Worthier Title. The doctrine has application where a grantor gives a life estate in property with a gift over to his "heirs" or "next of kin." Under the English common law the heir or next of kin was considered to take by descent or distribution and not by purchase. Under the common law, a man could not, by an *inter vivos* conveyance, make his rightful heir a purchaser. Since title by descent or distribution was considered "worthier" than a title by purchase, the heirs were to take by that title which was worthier. Thus, the common law considered an attempt to create a remainder in the grantor's heirs or next of kin to be void. *Bingham's Case*, 2 *Co. Rep.* 91a, 76 *Eng. Rep.* 611 (1598–1600); *Simes and Smith, Future Interests* (2d ed.

1956), § 1601. What the grantor retained was a reversion, thereby giving him the right to revoke an *inter vivos* conveyance where he was the sole life beneficiary, or a right to revoke in conjunction with other life beneficiaries. The doctrine was a positive rule of law under the English common law until abolished by statute in 1833. 3 *Powell, Real Property,* § 381 (1952). Today, most states consider the rule as one of construction, with a presumption that a reversion is intended in the absence of facts evidencing a contrary intention. See the discussions in 2 *Scott, Trusts (2d ed. 1956),* § 127.1; *Simes and Smith, op. cit.,* at §§ 1603, 1605; 1 *Am. Law of Real Property,* § 4.23 (1952).

The requirements of the rule are: (1) an *inter vivos* conveyance; (2) language therein which purports to limit the property to the heirs of the grantor (in the case of land) or to the next of kin (in the case of personal property), and (3) the conveyance must effectively create an interest other than the remainder to the heirs or next of kin. *Simes and Smith, op. cit.,* § 1606. The rule would apply to an *inter vivos* trust of personal property. It is similar to the Rule in Shelley's Case, the difference being that the Rule in Shelley's Case requires a limitation in favor of the heirs of the person to whom a prior estate for life is limited. On the other hand, the requirement for the application of the Worthier Title Doctrine is that the remainder must be limited to the heirs of the grantor and the preceding estate may rest in any person.

Various reasons have been given for the rule. Some of them are embedded in feudal origin. See *Simes and Smith, op. cit.,* § 1602. The rule appears to exist today as an attempt to effectuate the presumed intention of a grantor who does not desire to forego disposition during his life. The direction that upon his death there shall be a transfer to his heirs or next of kin is evidence of such intention. This is especially so in view of the fact that no one is an heir to the living. See *Doctor v. Hughes,* 225 N. Y. 305, 122 N. E. 221, 223 (*Ct. App.* 1919).

The leading American case discussing the rule is *Doctor v. Hughes, supra.* In this case, judgment creditors brought an

action against a daughter and son-in-law of the settlor of an *inter vivos* trust of land. The settlor provided that he was to receive $1,500 of the rents and profits for life, with certain powers in the trustee, and upon his death the property was to be conveyed to the settlor's "heirs at law." At the trial of the action the settlor was still alive. The court, in an opinion by Mr. Justice Cardozo, held that the settlor retained a reversion in the trust property which was subject to destruction, so that the daughter had a mere expectancy and not an estate. In view of this holding, there was nothing upon which judgment creditors could execute. The court stated, at *p.* 222 of 122 *N. E.,* that "in the absence of modifying statute, the rule persists to-day, at least as a rule of construction, if not as one of property." However, the court did intimate that intention was important by the statement that "to transform into a remainder what could ordinarily be a reversion, the intention to work the transformation must be clearly expressed. Here there is no clear expression of such a purpose." 122 *N. E.,* at *p.* 222. The largest body of law concerning the doctrine has been formulated by the New York courts. In *Whittemore v. Equitable Trust Co.,* 250 *N. Y.* 298, 165 *N. E.* 454 *(Ct. App.* 1929), the court held that a remainder was created in certain minor children of the settlor and the settlor was denied the right to revoke the trust without their consent. The court did not require that an intent to create a remainder be "clearly expressed," but merely asked: "Why should not this trust agreement be interpreted as it reads? What reason is there for giving it a legal construction just the opposite to its natural meaning?" 165 *N. E.,* at *p.* 455. Several other cases have found an intention to create a remainder where, after a life estate, a grantor gave a gift over to his heirs or next of kin. See, *e. g., Engel v. Guaranty Trust Co. of New York,* 280 *N. Y.* 43, 19 *N. E. 2d* 673 *(Ct. App.* 1939); *Richardson v. Richardson,* 298 *N. Y.* 135, 81 *N. E. 2d* 54 *(Ct. App.* 1948); *In re Burchell's Estate,* 299 *N. Y.* 351, 87 *N. E. 2d* 293 *(Ct. App.* 1949), reargument denied 300 *N. Y.* 498, 88 *N. E. 2d* 725 *(Ct. App.* 1949). See also *National Shawmut*

*Bank v. Joy,* 315 *Mass.* 457, 53 *N. E. 2d* 113 *(Sup. Jud. Ct.* 1944). In *In re Burchell's Estate, supra,* the court expressed the view that "the presumption which exists from the use of the common-law doctrine as a rule of construction has lost much of its force since Doctor v. Hughes, supra." 87 *N. E. 2d,* at *p.* 297. The court practically reversed the presumption that a reversion was intended by the following language:

"* * * It is impossible to set up absolute criteria to serve as a measuring standard for all cases. In the last analysis, the ultimate determination rests on the particular instrument under consideration, aided by the rule which has grown out of the old common-law doctrine and developed over a long line of cases as a rule which allows the language of the instrument creating a remainder to take effect provided some additional evidence pointing the intent of the grantor is present to buttress the language which would create the remainder." 87 *N. E. 2d,* at *pp.* 297-8

The *Burchell* opinion prompted the New York legislature to amend the Personal Property Law § 23, and the Real Property Law § 118, to provide that

"For the purposes of this section, a gift or limitation, contained in a trust created on or after September first, nineteen hundred fifty-one, in favor of a class of persons described only as heirs or next of kin * * *, does not create a beneficial interest in such persons."

The cycle had run its course and the Doctrine of Worthier Title was again a rule of law, at least in New York.

## REMAINDER OR REVERSION

The perplexing issues involved in this case have confronted other New Jersey courts in the past.

In *Fidelity Union Trust Co. v. Parfner,* 135 *N. J. Eq.* 133 *(Ch.* 1944), the settlor created an *inter vivos* trust of securities worth $24,000 and retained a life estate in the income. The person to take upon the death of the settlor (her daughter) died. In the event of this contingency the principal was to go to "such persons as the Donor shall designate and appoint in and by her last will and testament," and in default

of appointment "to and among her next of kin." No power of revocation was reserved. The court relied upon the *Restatement, Property*, § 314, for the proposition that such a conveyance creates a reversion in the settlor "unless a contrary intent is found from additional language." The court also cited the *Restatement, Trusts*, § 127, which provides that where a settlor reserves a life estate, a reservation of a power to appoint by will

"* * * is some indication that he intended to make his heirs or next of kin beneficiaries of the trust and to confer an interest upon them of which they cannot be deprived except by a testamentary appointment; but it is not of itself sufficient to overcome the inference that he intended to be sole beneficiary of the trust."

The court concluded that the settlor had no other beneficiaries in mind except herself and her daughter, and it permitted her to revoke the trust as the sole surviving beneficiary. Of obvious importance, however, was the fact that the settlor and her husband had a limited income, and her property, exclusive of the trust *res*, was rather small. Pertinent is the court's observation that "The present case is on the borderline and even slight indications of intention may influence the result." 135 *N. J. Eq.*, at *p.* 138.

In *Doyle v. Bank of Montclair*, 9 *N. J. Super.* 586 (*Ch. Div.* 1950), a settlor desired to terminate an *inter vivos* trust in which he was to receive a life income. At his death the principal was to go to those named in his will, and in the absence of a will "to his heirs at law if there be any real estate in the fund, and to his next of kin." A trust provision stated that it "shall be irrevocable." The court held that the settlor's intention was that the trust was revocable as evidenced by a paragraph in the trust where the trustee was empowered to use *corpus* for the settlor's financial assistance in case of illness, accident or extreme emergency. The court cited the general rules enunciated in *Fidelity Union Trust Co. v. Parfner*, *supra*, and *Restatement, Trusts*, § 127, but was undoubtedly influenced by two other factors. The settlor

contended that he was influenced in creating the trust because
he was an alcoholic but that this condition had been overcome.
The second factor was that the settlor was presently engaged
in his own business and was in dire financial circumstances.

A similar result was reached in *Manice v. The Howard
Savings Institution*, 30 *N. J. Super*. 267 (*Ch. Div*. 1954),
based upon a finding that the settlor intended herself to be
the sole beneficiary of an amended trust. The settlor reserved
a power to change beneficiaries, but she was only to receive
trust income for life and was not permitted to modify the
trust so as to receive any greater interest. The court reasoned
that by virtue of the expressed reserved power to change bene-
ficiaries, the settlor was the only person to hold a beneficial
interest in the trust, thereby giving her the right to revoke
the trust.

These three cases show that the Doctrine of
Worthier Title exists in New Jersey as a rule of construction,
creating an inference or presumption that a settlor intends
to create a reversion, but that the inferred or presumed in-
tention may be overcome by evidence showing a contrary in-
tention. Generally, a settlor's intention must be ascertained
from the terms of the entire trust taken as a whole. *Fidelity
Union Trust Co. v. Warren*, 135 *N. J. Eq*. 239 (*Ch*. 1944);
*Morristown Trust Co. v. Thebaud*, 43 *N. J. Super*. 209 (*Ch.
Div*. 1957). The New York cases have extensively considered
the factors deemed significant in determining an intention to
create a remainder. These factors have been collected from
the New York cases by Professors Simes and Smith in their
treatise on *Future Interests, op. cit*. § 1608, *pp*. 509–10.
They are:

"* * * (1) the fact that the grantor retains only a testamentary
power of appointment; (2) the fact the grantor retains no power to
alienate *inter vivos*; (3) the fact that the instrument purports to
make a full and complete disposition of the property; (4) the fact
that the grantor retains a power to withdraw only a limited amount
of the principal during his lifetime; and (5) the fact that no pro-
vision is made for the return of the principal to the grantor during
his lifetime."

See also *Richardson v. Richardson* and *In re Burchell's Estate, supra.*

 After carefully considering the extensive briefs and testimony at the trial of this case, the court has concluded that the plaintiff-settlor intended to create a remainder interest in those persons who would be her next of kin at the time of her death, subject only to the settlor's retained power to amend or revoke the trust for four years and ten months from the date of its creation. Absent a present power of revocation in the settlor, she cannot revoke the trust without the consent of all the beneficiaries. *New Jersey Title Guarantee & Trust Co. v. Parker*, 84 *N. J. Eq.* 351 (*Ch.* 1915), affirmed 85 *N. J. Eq.* 557 (*E. & A.* 1915); *Fidelity Union Trust Co. v. Parfner, supra.*

There are several factors which have led the court to its conclusion. In the first place, the trust purported to make a full and complete disposition of the trust property. After the limited period in which the settlor could revoke or amend the trust, she retained no power to grant, assign, control or alienate the property. Even her powers to amend or revoke for the four years and ten months were subject to the approval of one of her sons. Since they, along with the plaintiff, were income beneficiaries, it is entirely possible that their interest would have been adverse to plaintiff's thus preventing their ready acquiescence to her wishes. Further, if the plaintiff intended the creation of a reversion, a reserved power to revoke would be meaningless since such a power would, *a fortiori,* be included in a reversion. Although the settlor reserved a power to receive *corpus*, it was limited to 20% a year for a period of five years and was not exercisable after this five year period. This limited right to receive *corpus* was also conditioned upon the approval of one of her sons whose interest would be adverse to that of the settlor. Thus, any right which the settlor retained to receive principal during her lifetime was limited and only exercisable with the consent of one who held an interest adverse to hers.

Of great importance is the fact that the settlor failed to retain an *inter vivos* or a testamentary power of appointment. If the settlor retained a testamentary power of appointment, all she would have parted with would have been the administration of trust property during her life. The settlor would have had complete control over the distribution of the trust upon her death, and a gift over to "next of kin" would only be effective upon the settlor's failure to exercise the power. The retention of an *inter vivos* power of appointment would be tantamount to a power of revocation. The reservation of a testamentary power of appointment, *Fidelity Union Trust Co. v. Parfner, supra;* a power to name takers in the settlor's will, *Doyle v. Bank of Montclair, supra;* or a power to change beneficiaries, *Manice v. The Howard Savings Institution, supra,* were found important in determining that the settlor intended to create a reversion. Several New York cases considered the retention of only a testamentary power of appointment evidence that the settlor intended to create a property interest in persons other than himself. See *Engel v. Guaranty Trust Co. of New York, Richardson v. Richardson* and *In re Burchell's Estate.* The fact that no power to appoint or to change beneficiaries was reserved must be considered a determinative factor in finding an intention to create a remainder. It must be noted that the settlor did retain a power to change the proportionate amounts to be left to her next of kin, but this would not detract from their vested rights.

A factor in finding an intention to create a reversion was said by Vice Chancellor Bigelow to be whether the settlor intends "merely to let the law relating to decedents' estates, take its course?" *Fidelity Union Trust Co. v. Parfner, supra,* 135 *N. J. Eq.,* at *p.* 137. The power to change the proportionate shares of the beneficiaries negates such a finding. It must also be remembered that the results of the *Parfner* and *Doyle* cases were most probably influenced by the personal financial difficulties of the settlor.

As further evidence of the settlor's intention, the proofs show that the settlor did not believe herself the sole bene-

ficiary of the trust. She obviously had her two sons in mind when she created the trust, and was also concerned with her husband's estate, whose debts she authorized to be paid out of trust *corpus*.

Plaintiff did not testify in person because of her advanced age but her deposition was admitted into evidence. Although plaintiff testified that she considered the trust money to be hers, there is ample credible testimony that the amendments were prepared by her attorney, Mr. Armitage, and that she relied upon his advice and did everything he told her to do. Plaintiff also testified that she does not recall whether she read the purported amendments to the trust but that she likes the 1935 agreement and does not want it disturbed. The import of plaintiff's testimony was that she did not realize that the 1935 agreement had been changed and that she never intended to change it.

Defendants Elizabeth Judge and Annette Judge have raised many persuasive arguments. However, based upon the aforementioned findings, the court holds that any inference of an intention to create a reversion has been negated. The settlor did not have the power to amend the trust to the prejudice of possible future beneficiaries or to revoke the trust after January 6, 1940 without the consent of all the beneficiaries.

The trust was amended six times within the four year and ten month period, the last amendment being December 22, 1939. All of these amendments allocated income between the settlor and her two sons. It is clear that one of the main purposes of the trust was an income-splitting device to avoid or reduce income taxes. Further amendments dividing income were made in later years and the trust was substantially modified on October 22, 1946. It was this modification which reserved a life estate in the settlor and a remainder to the next of kin of the sons if they both predeceased the settlor and failed to designate persons to whom the trust assets were to be paid. Other amendments relating to income were executed subsequently.

In view of the finding that a remainder was created, the effect of the amendments subsequent to that of December 22, 1939 must be determined. It must be concluded that the amendments relating to income are all valid as between the settlor and her sons *inter sese*. Other than the validity of alleged defenses and alleged renunciation, plaintiff as surviving life beneficiary has the right to the income which has been accumulating in the trust since John Judge's death and to the sole life interest in any future trust income. The settlor was fully aware of the objective of splitting income and any amendments concerning income could not possibly prejudice the two infant beneficiaries because they had no right to the income. But the infant beneficiaries would be prejudiced by the amendment of October 22, 1946, insofar as it related to a distribution of *corpus* upon the death of their father, because of the possibility of their receiving a lesser share of the trust. Since this amendment was after the permissible four year and ten month period, the effect of the amendment on their rights in the *corpus* would be void unless, as defendants Elizabeth and Annette Judge contend, the amendment must be allowed to stand on the grounds of laches, ratification or estoppel.

## II.

Laches, Estoppel and Ratification By Virtue of the "Practical Construction" of the Trust Agreements.

Generally, laches consists of an unexplained and inexcusable delay in enforcing a known right whereby prejudice has resulted to the other party because of such delay. *West Jersey Title & Guaranty Co. v. Industrial Trust Co.*, 27 N. J. 144 (1958); *Stroebel v. Jefferson Trucking & Rigging Co.*, 125 N. J. L. 484, 487 (*E. & A.* 1940). The testimony shows that plaintiff might have been advised as early as 1947 or 1949 concerning the possible invalidity of the amendments. However, John did not marry Elizabeth until 1951 and Gilbert married Annette in 1953. These defendants have not shown how a delay in securing a judicial determination of the

validity of the 1940 and 1946 amendments has prejudiced or damaged them. These defendants also infer that the death of some of the lawyers has deprived them of important testimony. However, they do not state how their position has been prejudiced, nor do they give any inkling of what this testimony might have produced. Based upon these observations the court holds that plaintiff was not guilty of laches by failing to secure a legal adjudication of the trust prior to the institution of this suit.

■■ As to the question of estoppel, the essential elements of this defense are:

(1) Conduct amounting to a representation or a concealment of material facts.

(2) Facts known to the party allegedly estopped, or at least the circumstances must be such that knowledge of them can be necessarily imputed to him.

(3) The truth concerning the facts must be unknown to the party claiming the estoppel at the time when acted upon by him.

(4) The conduct must be done with the intention that it be acted upon by the other party.

(5) The conduct must be relied upon by the other party, and he must be led to act upon it.

(6) He must in fact act upon it in such a manner as to change his position for the worse.

See *Feldman v. Urban Commercial, Inc.,* 70 *N. J. Super.* 463, 474 (*Ch. Div.* 1961); *Central R. R. Co. of New Jersey v. MacCartney,* 68 *N. J. L.* 165, 175 (*Sup. Ct.* 1902). The proofs clearly show that the various elements of an equitable estoppel are not present. Plaintiff, relying upon the advice of her counsel made no representations or concealments of material facts. She did not understand any of the facts to be otherwise, except as stated by her counsel. There was no intent to influence the conduct of defendants Elizabeth and Annette Judge. The settlor's sons had just as much opportunity to ascertain the facts as the settlor had. In fact, the

proofs show that John inquired as to the effect of the various trust provisions as they applied to him. As a final observation, it must be noted that defendants Annette and Elizabeth Judge did not rely, act or make any change of position to their detriment in a legal sense. *Cf. Lawes v. Lynch, 7 N. J. Super.* 584 (*Ch. Div.* 1950), affirmed 6 *N. J.* 1 (1950) where it was held that an act done under a mistake or misapprehension of law where no other party is led to his disadvantage will not work an estoppel.

The defendants Elizabeth and Annette Judge assert that plaintiff has ratified the amendments by virtue of the Doctrine of Practical Construction. The rule is that where the terms of an agreement are doubtful or ambiguous, the conduct of the parties thereto will furnish a guide to determining what they meant. *Journeymen Barbers, etc., Local 617 v. Pollino,* 22 *N. J.* 389 (1956); *Kingston Trap Rock Co. v. Eastern Engineering Co.,* 132 *N. J. L.* 254 (*E. & A.* 1944). The rule has also been applied to the construction of *inter vivos* trusts. 5 *N. J. Practice* (*Clapp, Wills and Administration*) (*3d ed.* 1962) § 204, *pp.* 334–5. The court does not believe the doctrine to be precisely applicable in the case before it. No party has asserted any ambiguity. The language of the instruments is clear; the problem is the effect of the language as used. The mere fact that plaintiff signed the amendments does not mean that she ratified them. As alluded to previously, plaintiff testified that she believed that the 1935 agreement was always in effect and that she liked the 1935 agreement and did not want it changed. There is no evidence as to any statement by plaintiff (prior to the taking of her deposition) that she believed any particular agreement or amendment to be in effect as opposed to any other. The proponents of this defense do not show how they relied on the agreements to their damage or detriment. The inexorable conclusion is that no application of the Doctrine of Practical Construction shows that plaintiff intended to create a reversion in herself or that she ratified the amendments made subsequent to the four year and ten month period.

## III.

### The Purported Renunciation of Plaintiff's Life Estate

In 1956 plaintiff signed a document by which she stated that she renounced any life interest or estate in the trust. Plaintiff contends that this document is void because it was not a valid gift or assignment. The document contained the year "1956" but was otherwise undated. It was prepared by a Mr. Holloway at the request of John Judge. Mr. Holloway was the law partner of Mr. Armitage but he never represented plaintiff. Mr. Holloway and Miss Cummiskey, plaintiff's former secretary, witnessed the signing of the document. Mr. Holloway testified on deposition that the reason for the document was to effectuate a tax saving. The credible testimony shows that the plan was to place the document in plaintiff's safe until a time when she was in the throes of a last illness at which time the date could be completed. Mr. Holloway testified that he told John that he would not be responsible to the government in case any allegations of fraud were made. It is clear that after the signing of the document the ribbon copy was placed in plaintiff's safe and John took a signed carbon copy. Both Mr. Holloway and Miss Cummiskey testified that plaintiff never intended a delivery of the document at that time. Miss Cummiskey testified that the terms "renewed" or "rewritten" were used, but she clearly contended that the document was only to be effective upon Mrs. Clark's death. Mr. Holloway testified that he was positive as to this latter fact.

In order for a valid *inter vivos* gift to be established there must be proof of (1) a donative intent on the part of the donor; (2) an actual or symbolic delivery of the subject matter, and (3) an absolute divestiture of control, ownership, and dominion by the donor over the subject matter of the gift, at least to the extent practicable or possible under the circumstances. *Farris v. Farris Engineering Corp.*, 7 N. J. 487, 500–501 (1951) ; *Howard Savings Institution v.*

*Quatra,* 38 *N. J. Super.* 174, 178 *(Ch. Div.* 1955). The proponent of the gift must prove these elements by "clear, cogent and persuasive" evidence. *Farris v. Farris Engineering Corp., supra,* 7 *N. J.,* at *pp.* 500–501. The defendant Elizabeth Judge contends that the afore-mentioned testimony is incredible and not worthy of belief. On the contrary, the court believes the testimony to be entirely credible and finds that the requisite burden of proving a gift or proving the validity of the renunciation has not been sustained. The testimony of Elizabeth Judge concerning the time at which and the circumstances under which she first saw the renunciation is suspect. What is apparent is that the renunciation was never delivered or intended to be delivered. There is neither evidence of a donative intent on the part of the donor nor evidence of an absolute divestiture of ownership or control over the life estate by plaintiff. In any event, the ribbon copy of the document is missing and the testimony shows that it may have been destroyed in 1958. As further evidence to negate any divestiture of control over the trust income, it must be noted that plaintiff continued to receive her full share of trust income even after the alleged renunciation was signed. The income continued until John's death, when it stopped because the signatures of two trustees were necessary on trust checks.

The court also finds that there is no evidence that plaintiff intended a sale or assignment because an essential element of a valid contract—consideration—has not been proved. *Friedman v. Tappan Development Co.,* 22 *N. J.* 523 (1956); *Restatement, Contracts,* §§ 19, 75 (1932).

Based upon these findings the court holds the purported renunciation to be null and void. The life estates in all the beneficiaries were not terminated and the remainders could not be accelerated. Therefore the counterclaim of Elizabeth Judge seeking an adjudication that she is the immediate owner of a one-half interest in the trust is dismissed.

## IV.

OWNERSHIP OF THE OVERRIDING OIL ROYALTY INTERESTS

On January 31, 1939 the Wymond Trust purchased an interest in certain overriding oil royalties in Louisiana for the sum of $10,650. Title was taken in the name of one David G. Ackerman as nominee, because of some question of Louisiana law as to whether the trust could be the record title holder of such royalties. Mr. Ackerman collected the income from the royalties and paid it to the trust until July 11, 1949. On that date he executed a transfer of the royalties to John Judge. John Judge was not named a "nominee" in the transfer. Plaintiff contends that John had no interest in the oil royalties and that his purported transfer of the royalties to defendant Elizabeth Judge by two documents dated November 4, 1961 and November 28, 1961 is void. Defendant Elizabeth Judge argues that John never took the royalties as nominee but purchased them from the trust by borrowing $10,000 from said trust with his mother's consent. She alleges an agreement whereby John was to repay the loan with the income from the royalties. Defendant Elizabeth Judge testified that she gave John $10,000 in the fall of 1961 in payment for the royalties, after which he sent his $10,000 check to the First National Bank of Jersey City to repay the purported loan. She then began to collect the income from the oil royalties.

Although defendant Elizabeth Judge asserts that there is no evidence which shows that John Judge took the oil royalties as a "nominee," there are several letters by Mr. Ackerman and Mr. Armitage which refer to John as the "nominee" of the oil royalties. A letter written by John Judge to his office manager on September 14, 1949 was introduced into evidence. John inquired in this letter: "whatever happened regarding the Louisiana override that was formerly in David G. Ackerman's name as nominee which is supposed to be transferred to me as nominee for the Wymond Trust?" The evidence is clear that John held the royalties as nominee for the trust

and continued to so hold them until his death. From the time of the transfer of the oil royalties until October 1961, John deposited the royalty income in a Texas bank in his name as trustee. Payments were then regularly transmitted to the trust in New York. According to the trust account books, these payments amounted to $246,458.20 over the 22-year period 1939 to 1961. There is testimony that the trust books fail to reveal that John was indebted to the trust, and all the income tax records in evidence show the royalty income to be trust property.

As to any question of the jurisdiction of this court over the oil royalties, even assuming that the said royalties are real property, there is little doubt but that a court of equity can grant a judgment affecting title to foreign lands. Such a judgment does not operate as a conveyance of the land or as an *in rem* judgment, but the foreign land is affected indirectly due to the *in personam* operation of the judgment on the person of the defendant. *Bullock v. Bullock*, 52 *N. J. Eq.* 561 (*E. & A.* 1894); *Neise v. Krumacker*, 136 *N. J. Eq.* 75 (*Ch.* 1945); 4 *Pomeroy, Equity Jurisprudence*, (*5th ed.* 1941), § 1318.

The proof is conclusive that neither plaintiff nor the trust ever agreed to loan John money with which to purchase the royalties. Since John was a holder of the royalties as a nominee of the trust as well as a trustee of the trust itself, he breached his fiduciary duty by attempting to transfer the oil royalties to his wife. Even if John honestly believed he was the owner of the royalties by virtue of a "loan," the transfer would still be void because a trustee does not have the power to borrow money from trust assets unless there is an express or implied power to do so from the terms of the trust instrument or unless the trustee seeks and obtains court approval. *Bogert, Trusts & Trustees* (*2d ed.* 1962), § 751, c. 36; *Restatement, Trusts, 2d*, § 191 (1). The proofs show no such express or implied powers or court approval.

It is the law in New Jersey that a trustee is a special agent and a person dealing with him is chargeable with notice

of his authority. *Ordway Bldg. & Loan Ass'n v. Moeck,* 106 *N. J. Eq.* 425 (*Ch.* 1930). Professor Scott in his treatise has set forth the requirements of charging a transferee with notice:

"* * * [E]ven though the documents of title do not indicate that the property is held in trust, a transferee is not protected if the transfer was made in breach of trust and if the transferee had reason to know that the property was held in trust and that the transfer was in breach of trust. The circumstances may be such as to indicate the existence or at least the possible existence of a trust sufficiently to put the transferee on inquiry. If he suspected that the property was held in trust but closed his eyes and made no attempt to ascertain the correctness of his suspicions, he is obviously chargeable with notice. Even though he did not in fact suspect that the property was held in trust, yet if the circumstances were such as to indicate to a reasonable person in the position of the transferee that the property was held in trust, so that a reasonable person would have made inquiry, the transferee is chargeable with notice of the existence of a trust if a reasonable inquiry would have disclosed its existence." *Scott, Trusts* (2d ed. 1956), § 297.3, *p.* 2213.

"Where the transferee has notice of the existence of a trust and of the terms of the trust, and if he had used due diligence would have ascertained that the transfer is in breach of trust, he takes subject to the trust. * * *" *Ibid.,* § 297.5, *p.* 2221.

 The testimony is clearly convincing that Elizabeth Judge was not a *bona fide* purchaser in that she knew or should have known that the oil royalties were trust property. She knew that the royalties were now worth about $250,000, and she purportedly paid for them by borrowing $10,000 upon her husband's guarantee. She participated in a meeting in 1960, purportedly as a trustee, and she further testified that for some time after purporting to act as a trustee she knew that the royalty income was being funneled through the trust. Defendant knew that her husband was a trustee of the trust and she knew what the duties of a trustee were. She also testified that she knew her husband had acquired title to the oil royalties through a deed from Mr. Ackerman, despite his statements to her that he had acquired them elsewhere. In view of the court's conclusion, it is obvious that defendant Elizabeth Judge would be unjustly enriched if she were al-

lowed to keep the oil royalties or the income from them which she has received and retained since the fall of 1961. A court of equity will impress a constructive trust upon property on the grounds of unjust enrichment. *Moses v. Moses,* 140 *N. J. Eq.* 575 (*E. & A.* 1947) ; 2 *Scott, Trusts,* § 462.1. The statement of our Supreme Court in *Stretch v. Watson,* 5 *N. J.* 268, 279 (1950), is particularly applicable to the facts *sub judice:*

"It is familiar principle that equity will pursue property wrongfully converted by a fiduciary, or otherwise compel restitution. As between the *cestui* and the trustee and all persons claiming under the trustee otherwise than by a *bona fide* purchase for a valuable consideration without notice, actual or constructive, all property belonging to the trust, however much it may be changed or altered in character, continues to be subject to or affected by the trust."

The defendant Elizabeth Judge is ordered to reconvey the Louisiana overriding oil royalties to the trust, and is further ordered to account for and repay to the trust any oil royalty income received by her from October 1961 to date with lawful interest.

## V.

### DEFENDANT ELIZABETH JUDGE'S STATUS AS TRUSTEE AND OWNER OF HER HUSBAND'S INTEREST IN TRUST INCOME AND CORPUS

The document executed by John Judge purporting to appoint defendant Elizabeth Judge a trustee in the place of Gilbert was exercised pursuant to the power granted by article Ninth of the trust amendment dated October 22, 1946, which allowed John Judge to appoint a successor trustee if he and Gilbert could not agree on a successor (to the prior trustees). Since Gilbert was dead, he certainly could not consent. Although any amendment made in 1946 would be void insofar as it might affect or prejudice the rights of the ultimate beneficiaries, this amendment, on its face, would not do so and Elizabeth Judge could be a trustee. However, in view of the findings and conclusions concerning the actions of Eliz-

abeth Judge as the purported owner of the oil royalties, the court does not believe that it would be in the best interests of the trust if Elizabeth Judge were to remain a trustee. A court may remove a trustee for acts done in breach of the trust or detrimental to the welfare of the trust, for lack of honesty or reasonable fidelity to the trust, for acts done which have diminished or endangered the trust, or even to protect the trust against possible future jeopardy. *Taylor v. Errion*, 137 *N. J. Eq.* 221 (*Ch.* 1945), affirmed 140 *N. J. Eq.* 495 (*E. & A.* 1947); *Braman v. Central Hanover Bank & Trust Co.*, 138 *N. J. Eq.* 165 (*Ch.* 1946); *Restatement, Trusts 2d*, § 107. The court believes that all of the foregoing grounds apply to defendant Elizabeth Judge. She is hereby ordered removed as trustee and is restrained and enjoined from using any document which purports to give her status as a trustee. The court further holds that plaintiff has the right to appoint two successor trustees by virtue of the second paragraph of article Ninth of the original trust agreement dated March 6, 1935.

 Based upon the foregoing comments concerning Elizabeth Judge, the court denies her right to any commissions as trustee because her conduct toward the trust property must be classified as gross misconduct, willful or fraudulent. See *Ditmars v. Camden Trust Co.*, 10 *N. J. Super.* 306, 338 (*Ch. Div.* 1950); *In re Bender*, 122 *N. J. Eq.* 192 (*Prerog.* 1937), affirmed o. b. 123 *N. J. Eq.* 171 (*E. & A.* 1938); *The Pennsylvania Company, &c. v. Gillmore*, 142 *N. J. Eq.* 27, 51 (*Ch.* 1948); *McCulloch v. Tomkins*, 62 *N. J. Eq.* 262 (*Ch.* 1901). See also *N. J. S.* 3A:10-7 which provides that "Where a fiduciary is removed by the superior or county court for any cause, the court may direct that his commission be forfeited."

Although plaintiff attacks the validity of a document dated a few months before John Judge's death, whereby he purports to assign to Elizabeth Judge his interest in trust *corpus* or income, there was no testimony adduced at trial on this point. Since payments of income were to be in equal quarterly payments, the most Elizabeth Judge could have been entitled to was one payment of John's income. The question of *corpus*

distribution has already been decided adversely to Elizabeth Judge.

Counsel may submit a form of order in accordance with this opinion pursuant to *R. R.* 4:55–1.