227 N.J. Super. 135 (1988)
545 A.2d 841
KATHERINE BATTISTA, AS ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF WILLIAM NICHOLAS BATTISTA III, DECEASED AND INDIVIDUALLY AND AS ASSIGNEE OF PAUL OLSON, PLAINTIFF,
v.
WESTERN WORLD INSURANCE COMPANY, INC., THE AETNA CASUALTY & SURETY COMPANY, INC., LIEB, BERLIN AND KAPLAN, A PROFESSIONAL CORPORATION, AND THE BOROUGH OF LEONIA, DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Decided February 3, 1988.
*137 Leopold A. Monaco for plaintiff (Monaco and Oratio, attorneys).
Bruce A. Tritsch for defendant, Western World Insurance Company, Inc. (Feinberg, Feinberg and Tritsch, attorneys).
Michael B. Oropollo for defendant, The Aetna Casualty & Surety Company, Inc. (Hoagland, Longo, Oropollo and Moran, attorneys).
William W. Voorhees, Jr., for defendant, Lieb, Berlin and Kaplan (Voorhees and Stein, attorneys).
John G. Tinker, Jr., for defendant, The Borough of Leonia (W. Stephen Leary, attorney).
*138 MARGUERITE T. SIMON, J.S.C.
Plaintiff in this matter seeks to enforce a settlement admittedly tailored as an attempt to meet the requirements of Griggs v. Bertram, 88 N.J. 347 (1982).

BACKGROUND
The underlying litigation resulted from the tragic death of eighteen-year-old William N. Battista, III, on January 12, 1982. His mother, Katherine Battista, brought an action against the Borough of Leonia and three police officers, Carmey Cross, Todd Cieslak and Paul Olson, alleging failure to provide emergency medical assistance and seeking both compensatory and punitive damages. Plaintiff in that lawsuit alleged that, rather than providing necessary emergency medical assistance for William Battista, the Leonia police officers prepared to arrest him on an outstanding municipal court warrant. William Battista had failed to appear in response to a charge of drinking beer in public. When the police officers later responded to a second call for help, it was too late to revive the young man. Any reference to the facts and sequence of that lawsuit is made solely from the testimony and exhibits from that case which were introduced in the present matter as this court has been unable to locate the complete court file in that action, Battista v. Borough of Leonia, Docket No. L-66790-81.
A Law Enforcement Officers Liability Policy (P15EV) from Western World Insurance Company, Inc., (Western World) covered individual members of the Leonia Police Department with limits of $500,000 (per person, per incident and per year) and expressly excluded coverage for exemplary or punitive damages. A second policy (P25EV) from Aetna Casualty & Surety Company (Aetna) insured the municipality in the same amount, excluding individual police officers and also excluding punitive damages.
The law firm of Lieb, Berlin and Kaplan was retained through Western World and filed an answer on behalf of the Borough and each of the individual police officers as to all *139 counts (compensatory and punitive) of the complaint. Additional answers were filed on behalf of the Borough by Durkin and Boggia, municipal attorneys, who responded to all counts, and Harwood Lloyd, through Aetna, who responded to compensatory counts only. By motion preceding trial, the Borough successfully obtained the dismissal of punitive counts as to the municipality. The incident took place at the Crawbuck residence and Mr. and Mrs. Crawbuck as well as their son, John, were eventually named additional defendants and represented by separate counsel.
A thirteen day jury trial commenced June 13, 1984 before the Honorable Edward J. Van Tassel. Donald L. Berlin of Lieb, Berlin and Kaplan acted as trial counsel for the three police officers and Frank Lloyd tried the matter for the Borough of Leonia. In its verdict, the jury assessed compensatory damages at $60,000 and found Officer Olson fifty percent negligent, the Borough of Leonia thirty-three percent negligent and Officer Cieslak seventeen percent negligent. Officer Cross was found to be not negligent. The jury answered "yes" to jury interrogatory question Number 19 which provided, "If you find Paul Olson guilty of negligence, were his acts of negligence intentional, willful, wanton and/or malicious?" Punitive damages were set at one million dollars against Officer Olson only.
Several post-verdict motions and applications were made including a motion by Mr. Berlin on behalf of defendants Borough of Leonia, Todd Cieslak and Paul Olson for a judgment notwithstanding the verdict or, in the alternative, a new trial. By letter dated July 27, 1984 (P30EV), Judge Van Tassel alluded to the then recent Opinion Number 534 of the Advisory Committee on Professional Ethics and stated that Mr. Berlin, by his multiple representation, was placed in a conflicting position and that independent counsel should be retained immediately. It was a short time before this letter, approximately mid-July 1984, that defendant, Paul Olson, had retained John Altieri as his independent attorney. Both Mr. Berlin and Mr. Altieri entered their appearances on August 1, 1984 when *140 Judge Van Tassel delivered his decision on the motions referred to above.
At that time, Judge Van Tassel reiterated his prior determination that it was appropriate to present the issue of punitive damages to the jury. With regard to the amount of punitive damages, he commented that no testimony had been adduced as to the defendant Olson's assets and stated: "Now, the verdict, of course, of a million dollars under those circumstances, I will give it to you straight out. It is outrageously high. It cannot stand." Judge Van Tassel then remitted that amount to $75,000, an amount not accepted by the parties. Accordingly, the matter was set down for a new trial as to the amount of punitive damages only.
During the period preceding the new trial on damages, John Altieri became aware of the existence of a Policeman's Benevolent Association (P.B.A.) Agreement between the Borough of Leonia and its police officers (P16EV) containing the following language:
... the Borough shall provide legal services to all members of the police department as may be named as defendants in any legal action for incidents arising out of the performance of the employee's duties as a member of the department and further, the Borough agrees to hold the employee harmless and to indemnify the employee for all payments required to be made by the employee as a result of any judgment recovered against the employee arising out of such litigation.
This provision does not apply to any action, "... occasioned by the employee's willful detour from the prescribed duties and regulations of the department."
A deposition, before the new trial and in accordance with a court order, disclosed the assets and liabilities of Lieutenant Olson, as recorded on a document (P18EV). On the date set for the new trial on punitive damages, September 3, 1985, attorneys John Altieri and Lawrence Weintraub placed the terms of a settlement on the record before the Honorable Arthur Minuskin. Testimony was taken from Mrs. Battista and Lieutenant Olson as to the voluntariness of the settlement only, and no testimony was taken as to the merits of the matter. The terms *141 of the agreement were incorporated into a written document (P2EV) executed by both Battista and Olson. The plaintiff and defendant settled the amount of punitive damages at one million dollars, the amount of the jury award. The detailed document consists of ten numbered paragraphs and provides, in part, that Battista will join in a future lawsuit to seek indemnification for that amount. It states:
(3) Olson hereby agrees to give to Battista an irrevocable offer of assignment to any and all claims he may have under any and all policies of insurance and/or indemnification, such an assignment to be effective at the exclusive option of Battista. In return Battista agrees to limit her recovery of the $1,000,000 from the insurance companies and other defendants; and not to seek recovery from Olson personally.
Olson agrees to start suit within 45 days against Western World, the Borough of Leonia, Aetna, and Lieb, Berlin and Kaplan, naming Battista as a party defendant. It further provides:
(8) With respect to the lawsuit about to be filed, Olson and Battista both agree that in light of Olson's own claims for injuries and damages due to the tortious conduct of the defendants, breach of fiduciary relationship and conflicts of interest, as well as breaches of various contracts for insurance and indemnification and in view of his desire to assert those claims in his own right, that Olson will also seek claims for indemnification for Battista on her behalf in his name in that same suit as well. In the event, however, at any time Battista feels that she wants to be substituted in place of Olson on the claims for indemnification, then the parties hereby agree that she has the right to exercise that option and Olson will agree to substitute her in his place and stead. Olson, nevertheless, retains the right to pursue his own claims in that event.
The present action was begun on December 13, 1985, with the filing of a complaint by Paul Olson seeking enforcement of the indemnification provisions of the settlement agreement, recovery against Western World and Aetna for emotional distress, and recovery against Leonia for counsel fees and indemnification under the P.B.A. Agreement. A case management conference before the Honorable Peter Ciolino, Assignment Judge, resulted in the entry of an order dated May 14, 1987, substituting Leopold A. Monaco as counsel for Battista, amending the caption to name Battista plaintiff and setting the matter for trial. That conference also resulted in the execution of an *142 Assignment (also P2EV) whereby Olson assigns all his rights enumerated in Paragraph 3 of the Settlement Agreement in accordance with Paragraph 8 of that Agreement. In addition, in that Assignment, Olson agrees to the abandonment of his own claims for personal injuries and that his attorney, Mr. Monaco, will represent Mrs. Battista in pursuing her interests as well as in pursuing Olson's interest in seeking indemnification. Olson agrees to cooperate in connection with this lawsuit.
The resulting bench trial of this matter, involved extensive testimony over the course of several weeks. Motions granted at various stages of the trial resulted in the dismissal, either with or without prejudice, of certain claims and of defendant Lieb, Berlin and Kaplan and defendant Aetna. The issues remaining to be considered involve the enforceability of the settlement agreement as to defendant, Western World, and the responsibility of defendants Borough of Leonia and Western World for counsel fees.

ESTOPPEL
Western World never denied its coverage of the individual officers as to the incident in question and it has paid the compensatory award in the underlying lawsuit. The Western World policy (P15EV) excludes coverage for punitive or exemplary damages. The facial validity of this exclusion is not challenged. See City of Newark v. Hartford Accident & Indemnity Co., 134 N.J. Super. 537 (App.Div. 1975); City Council of Elizabeth v. Fumero, 143 N.J. Super. 275 (Law Div. 1976). Therefore, before examining the agreement in accordance with standards enunciated in Griggs v. Bertram, 88 N.J. 347 (1982) and Fireman's Fund Insurance Company v. Security Insurance Company of Hartford, 72 N.J. 63 (1976), this court must consider whether Western World has, by its conduct, been estopped from denial of coverage for punitive damages.
The evidence presented at this trial offers overwhelming proof that Western World, through the conduct of its employees and agents, is estopped from denying coverage for punitive *143 damages to Lieutenant Paul Olson. Indeed, it appears that, to a greater or lesser degree, the conduct on behalf of this carrier in several different respects, might be sufficient to invoke the estoppel concept. Taken cumulatively, there is no question whatsoever that the carrier cannot deny coverage for punitive damages.
Certain factual findings can be specified at this time. Western World argues that a certain amount of knowledge as to insurance practices is to be attributed to Lieutenant Olson by virtue of his having taken certain courses and his having participated in certain P.B.A. negotiations. Observation of Lieutenant Olson's demeanor and his testimony indicates clearly that he is not an individual possessed of that degree of education and sophistication that might preclude estoppel. For example, Lieutenant Olson testified that he believed the policy limits to be $75,000. Indeed, a deposition summary prepared by Marc L. Dembling, Esq. of Lieb, Berlin and Kaplan, and sent to Arthur Mintzer (P22EV) of Western World states: "Olson is not a particularly good witness and I do not believe he is extremely bright. He is personable, but has difficulty understanding what is said to him."
This court also specifically finds that Western World cannot avoid the results of its failure to act properly as to Paul Olson both in not obtaining a valid reservation of rights before participation and in maintaining control during trial of the prior litigation, by "passing the buck" to Philip Boggia, Esq. It is true that Lieutenant Olson knew Mr. Boggia for many years as a result of having resided in the same neighborhood in Leonia and stated that he had confidence in him. However, all of Mr. Boggia's contact with this matter arose as a result of his position as Borough Attorney for Leonia. Mr. Boggia appears to have, unlike Mr. Berlin, recognized the real potential of an award for punitive damages. Mr. Boggia's meeting or meetings were to alert the officers that the Borough would not be covering them for punitive damages and that they had the right to seek independent counsel. Mr. Boggia did not assist Mr. *144 Berlin in trial preparation but merely cooperated in order to afford access to certain matters. Mr. Berlin acted as trial counsel and as such, he had control over the conduct of the case. Mr. Boggia never directly participated in settlement negotiations.

A. Reservation of Rights

Western World is estopped to deny coverage because it failed to obtain an express reservation of rights from Olson. A carrier who defends an action unsuccessfully, may not later deny coverage without having obtained an express agreement whereby the insured agrees to that reservation. Burd v. Sussex Mutual Insurance Co., 56 N.J. 383, 390 (1970); Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114 (1962). Western World's first notice of Mrs. Battista's claim was early in 1982 as transmitted by the insurance agency. They received a letter from Lawrence Weintraub on or about February 1, 1982. That carrier did nothing until it received notice of the actual lawsuit on August 13, 1982. The deposition of Arthur Mintzer introduced in evidence (P20EV) indicates they did nothing as they believed that there was a question as to coverage of the incident. This, in itself, might possibly be sufficient to estop the carrier, for as the court stated in Griggs v. Bertram, 88 N.J. 347 (1982):
We therefore conclude that where, after timely notice, adequate opportunity to investigate a claim and the knowledge of a basis for denying or questioning insurance coverage, the carrier fails for an unreasonable time to inform the insured of a potential disclaimer, it is estopped from later denying coverage under the insurance policy in the event a legal action is subsequently brought against its insured. [at 363-364].
On August 20, 1982, Arthur Mintzer, Senior Claims Examiner for Western World sent a letter (P20S-EV) to Lieutenant Olson. This letter has been characterized by counsel as a "non-specific reservation of rights letter." It states that they will undertake the defense of Olson and that they do not waive any rights or defenses. The letter provides:

*145 We are reserving our rights to disclaim coverage to you because we believe coverage should be provided to you by your general liability carrier. Further, it does not appear that the proximate cause arose out of or in the course of the officers duties in making or attempting to make an arrest.
The letter calls for the insured to respond by return mail if he does not agree to its terms. Nowhere in this letter are punitive or exemplary damages ever mentioned. This court finds that this letter falls far short of the kind of express agreement required by Burd v. Sussex Mutual Insurance Co. and Merchants Indemnity Corp. v. Eggleston. It does not serve to alert the insured that the carrier will not be covering him for exemplary or punitive damages.
Lieb, Berlin and Kaplan filed an answer on behalf of all three police officers and the Borough of Leonia. Lieutenant Olson appeared for a deposition at which Marc Dembling, Esq., appeared for Lieb, Berlin and Kaplan. Lieutenant Olson testified before this court that he was not aware of Mr. Dembling's function. Lieutenant Olson's first contact with Donald Berlin, his trial counsel, was either on the trial date or one or two days before trial.

B. Control of the Trial

It has been stated that prejudice is inevitable when the insured is denied the right to maintain complete control of the defense of the damage action. Eggleston, 37 N.J. at 129. The Appellate Division has stated:
The claim for punitive damages should not be defended by the carrier, even though conceivably we might assume, by reason of the present action by the city, that the policemen are willing to undertake that risk... There is a possible conflict of interest between the policemen and the carrier even with respect to compensatory damages for the offenses covered by the policy  e.g., whether the injury is the result of the kind of intentional act for which coverage may be provided by law. [Newark v. Hartford Accident & Indemnity Co., 134 N.J. Super. 537 at 548-549 (App.Div. 1975)].
In City Council of Elizabeth v. Fumero, 143 N.J. Super. 275 (Law Div. 1976) the court referred to that city and its individual officers:

*146 ... there is no such obligation to indemnify a judgment for punitive damages. There is, therefore, an inherent conflict between the interests of the city and the individual police officers on the punitive damages issue, and it would be improper for the attorney supplied by the city to represent the individual defendants on that claim. [at 288].
No one who testified in this matter had other than the highest praise for the ability of Donald Berlin and the high level of competence he displayed during the trial of the underlying case. However, the inherent conflict between possible characterization of certain acts as either intentional or willful, wanton and/or malicious making a defendant subject to possible punitive damages (not covered) and the possible characterization of those same acts as negligent making the defendant subject to possible compensatory damages (covered) is self-evident.
Lieutenant Olson was particularly at risk as he was the tour commander. He was the only police officer characterized as "not a particularly good witness" in the deposition report (P22EV). That same report stated, "Indeed, after this incident he had an altercation with Cross and Cross was eventually suspended from the force for six months." There was also possible conflict between co-defendants Olson, Cross and Cieslak.
The control of the trial of the underlying matter as to both punitive and compensatory counts and as to all three officers by counsel supplied by Western World might be sufficient in itself to estop the carrier from denying coverage. When such control is considered in conjunction with the lack of an informed reservation of rights, estoppel is clear.

C. Failure to Settle

Rova Farms Resort v. Investors Insurance Co., 65 N.J. 474 (1974) has been a persistent theme throughout this case. Philip Boggia sent the carriers' counsel a Rova Farms letter before trial (P21EV) and John Altieri sent a second Rova Farms letter prior to the new trial on damages (P5EV).
*147 Extensive testimony has been presented as to settlement negotiations from several of the attorneys involved and from the deposition of Judge Van Tassel (P32EV) and Donald Berlin (P23EV and P24EV). During settlement negotiations prior to and during trial, plaintiff's counsel did not differentiate his demand as to compensatory and punitive damages. Discussions dealt solely with the total amount necessary to dispose of the matter. Plaintiff first demanded $250,000 to settle; then demanded $200,000 and indicated possible consideration of $175,000. Frank Lloyd, who represented the Borough of Leonia on compensatory claims only, testified convincingly that he did offer $48,000 to settle on behalf of his client. Donald Berlin felt that, since it was only necessary his carrier consider compensatory damages, Lawrence Weintraub's demand was clearly excessive. He stated that Mr. Weintraub would not differentiate between punitive and compensatory. Judge Van Tassel characterized the parties as "too far apart." Mr. Berlin and Western World contend that the unreasonableness of plaintiff's counsel's demands and Western World's accurate evaluation of the case are buttressed by noting the jury's actual compensatory award of $60,000.
Western World argues that punitive damages were inappropriate in the underlying matter and they should not have had to consider them. By assuming control of the defense, they had to consider the realities of the case and the rulings of the trial judge. This situation is not unlike the argument which had been propounded by the carrier in Rova Farms that liability was questionable. By failure to settle in each type of situation, it is the less culpable defendant who would have the most personal exposure and who could suffer the most financially.
This court finds that where a carrier assumes control of representation of an individual as to all claims, including punitive claims, without a valid reservation of rights, no differentiation as to settlement obligation can logically be made between a policy limits case and the present punitive damages situation. Lieutenant Olson's situation would have been similar in an *148 excess verdict case. "It is always to the benefit of the insured to settle and thereby avoid the danger of an excess verdict. Since an insurer serves only its own interest by declining to compromise within the insurance coverage, a decision not to settle is perforce a selfish one." Rova, 65 N.J. at 498. Here, Western World, by assuming control of Olson's defense as to all counts, without having obtained a valid reservation of rights, placed itself in the unfortunate position of being required to consider a settlement offer within the policy limits that may have been unreasonable if considered as to compensatory claims only. Therefore, the Rova Farms theory is also operative to preclude Western World from denying coverage as to punitive damages.

SETTLEMENT TERMS
The threshold matter of estoppel having been established, this court must now consider the terms of the settlement. Despite testimony that attorneys from firms representing Western World and Aetna may have been present in Judge Minuskin's courtroom (on other matters), the day the settlement was placed on the record, it is clear that they did not participate in negotiating the settlement terms. By correspondence, John Altieri advised all defense counsel of his interest in settling the punitive damages matter (P3EV and P4EV). Donald Berlin advised Mr. Altieri that he was not authorized by Western World to effect any settlement without their consent (DW40EV).
The carrier did not participate in the settlement negotiations. "While the right to control settlements is an important and significant provision of the policy contract ... it is a right which an insurer forfeits when it violates its own contractual obligation to the insured." Fireman's Fund Insurance Co. v. Security Insurance Co. of Hartford, 72 N.J. at 71. The Supreme Court in Griggs held that since that carrier was estopped from denying coverage, it was similarly estopped from insisting on compliance with a "no action" provision prohibiting *149 recovery unless the carrier participates in the settlement. Griggs v. Bertram, 88 N.J. at 364. For such a settlement to be enforceable, it must be a reasonable good faith settlement. Fireman's Fund; Griggs. Accordingly, this court must determine the good faith of the parties and the reasonableness of the settlement terms.
It is to be noted that this court finds that neither Judge Minuskin's acceptance of the settlement agreement in open court nor his signing of the order of judgment signify his approval of the terms thereof. The court's acceptance of the parties' settlement in a matter as this, where no minor is involved, is a daily occurrence which does not involve an in-depth examination of the terms of such settlement. See Pascarella v. Bruck, 190 N.J. Super. 118 (App.Div. 1983).
At the present trial, Mrs. Battista testified as to the personal distress she endured during the first trial, her poor health, and her reticence to relive the circumstances surrounding her son's death during a second trial. Lieutenant Olson testified that he felt he had just made a bad judgment call  it wasn't "punitive." Lieutenant Olson's attorney, Donald Berlin, stated his client was concerned about financial ruin. Lawrence Weintraub acted diligently and competently on behalf of Mrs. Battista at all stages of the proceeding. Within a few weeks after the jury verdict, Mr. Weintraub, by letter to Philip Boggia (DW33EV) indicated his intent to start a lawsuit against the insurance carriers. John Altieri's correspondence with counsel for the various defendants, mentioned above, indicate Mr. Altieri's openness as to his position. All of these findings lead to the conclusion that neither the parties to the settlement agreement nor their attorneys acted other than in good faith in their decision to settle without the carriers' participation. It is to be noted that Griggs v. Bertram, 88 N.J. at 366 provides that the ultimate burden of persuasion rests with the insurer. Here, Western World has not met its burden that the parties acted other than in good faith.
*150 On the other hand, no matter where the burden of proof is placed or however stringent that burden is considered, the settlement amount of one million dollars must be held unreasonable. A jury award which was unhesitantly remitted by the trial judge to less than one-thirteenth its value cannot be considered a reasonable settlement figure. The very concept of settlement implies some element of compromise. None is present here. The parties to the agreement allege that the plaintiff waived her right to interest on the million dollar amount. This is non-existent interest on an amount which was not reduced to judgment. They also refer to exposure to an even larger amount. The one million dollar jury award was set aside by Judge Van Tassel largely because it bore no relation to assets of Lieutenant Olson. McDonough v. Jorda, 214 N.J. Super. 338 (App.Div. 1986), although decided after the matters being considered by this court, refers to established concepts and states:
In assessing exemplary damages, a jury must take into consideration the wealth of the defendants. Leimgruber v. Claridge Associates, 73 N.J. [450] at 456. This is so because the theory behind punitive damages to to punish for the past event and to prevent future offenses, and the degree of punishment resulting from a judgment must be, to some extent, in proportion to the means of the guilty person. Restatement (Second) of Torts § 908 comment d (1977). [at 349].
The parties to the settlement agreement were aware of the assets of Olson, having taken his deposition in preparation for the new trial on damages. As a police officer, he earned $32,000 a year gross salary. He owned as tenant by the entirety with his wife a house assessed at $50,200. In addition, he and his wife had $6,000 in an IRA and $500 in a savings account. The parties would not have settled in this amount had Olson been responsible to pay.
Plaintiff appears to argue that Olson's rights against the insurance carrier or carriers, characterized as "choses in action," amount to assets that can be considered in establishing an award of punitive damages. This is circuitous reasoning at best. Although Western World is estopped from denying coverage *151 for punitive damages, the estoppel cannot serve to make it responsible to pay damages in an amount that would never have been considered by the parties were the insurance company not the responsible entity.
Accordingly, this settlement cannot be enforced. The present proceeding involved a consideration of the underlying litigation with regard to the matters discussed in this opinion. It did not consider the details surrounding the death of William Battista and the conduct of Lieutenant Paul Olson. It would be arbitrary and inappropriate for this court to set an amount of punitive damages. This matter must be set down for a new trial as to punitive damages with defendant Western World obligated to pay the amount of any such award.

LEGAL FEES
John Altieri, Esq., seeks an award of legal fees for his services in connection with his representation of Lieutenant Paul Olson. Fees are sought from the Borough of Leonia as a result of the provision in the P.B.A. Agreement cited earlier in this opinion. Testimony indicates that Mr. Altieri, in representing Lieutenant Olson, agreed not to collect his legal fees personally from Lieutenant Olson. Testimony and exhibits indicate that bills for services were sent by Mr. Altieri to Mr. Boggia seeking reimbursement from the municipality. The same award of legal fees is also sought against defendant Western World pursuant to R. 4:42-9(a)(6). This rule is applicable since Lieutenant Olson has been successful in regard to his claim that Western World is estopped from denying coverage as to punitive damages.
The total amount of legal fees sought by John Altieri are $17,806.08. This is based upon an hourly rate of $85 per hour, which rate is fair and reasonable. Counsel for Leonia argues that their services are not the result of Lieutenant Olson, "named as defendant," but rather from posttrial matters. This court finds that most of these services directly arose from problems as to coverage when Lieutenant Olson was named as *152 a defendant in the underlying lawsuit and, therefore, are logically included within the above definition. However, this court agrees with the Borough of Leonia that the services expended in pursuit of the individual tort claims of Lieutenant Paul Olson (which claims were later dropped) would not fall within that definition.
The same reasoning applicable to inclusion of these services within the context of the P.B.A. Agreement would also hold the services within the scope of those contemplated by R. 4:42-9(a)(6). Under the facts of this case, it would be an appropriate exercise of discretion to deem Western World also responsible for the payment of the greater amount of Mr. Altieri's fees. Mr. Altieri testified that he could not separate the hours spent on the personal claims of his client. Upon review of his bills, it is concluded that a fair deduction for the time expended on such claims would leave the amount to be reimbursed at $15,000. Since responsibility for legal fees is primary under each theory, this court finds both Western World and Leonia concurrently liable for that amount.