957 F.2d 1153
 35 ERC 1369, 60 USLW 2635, 22 Envtl.
L. Rep. 20,827
 LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff-Appellee,
v.
TRIANGLE INDUSTRIES, INCORPORATED, a/k/a ANC Holdings,
Incorporated; Triangle PWC, Incorporated,
Defendant & Third Party Plaintiffs-Appellants,
v.
NEW JERSEY PROPERTY-LIABILITY GUARANTY ASSOCIATION, on
Behalf of IDEAL MUTUAL INSURANCE COMPANY, in liquidation,
Zurich-American Insurance Companies, 91-1685 Zurich
Insurance Company, Third Party Defendants-Appellees,
and
Wausau Insurance Companies, Employers Insurance of Wausau,
Third Party Defendants.
Westinghouse Electric Corporation, International Business
Machines Corporation, Olin Corporation, American Fiber
Manufacturers Association, American Petroleum Institute,
Chemical Manufacturers Association, Insurance Environmental
Litigation Association, Amici Curiae.
 No. 91-1685.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1991.
Decided March 2, 1992.
As Amended March 10, 1992.
 
 Stephen M. Orlofsky, Blank, Rome, Comisky & McCauley, Cherry Hill, N.J., argued (Carlo Scaramella, on brief), for defendants and third party plaintiffs-appellants.
 Lee Hadas Glickenhaus, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, Mass., argued, for third party defendants-appellees.
 William F. Greaney, Covington & Burling, Washington, D.C., for amici curiae American Petroleum Institute and Chemical Mfrs. Ass'n; H. Woodruff Turner, Peter J. Kalis, David M. Aceto, Thomas M. Reiter, William J. Pohlman, Kirkpatrick & Lockhart, Pittsburgh, Pa., for Amici Curiae Westinghouse Elec. Corp., American Fiber Mfrs. Ass'n, Intern. Business Machines Corp., and Olin Corp., on the brief.
 Thomas W. Brunner, Marilyn E. Kerst, Steven B. Long, Wiley, Rein & Fielding, Washington, D.C., for amicus curiae Ins. Environmental Litigation Ass'n.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and SHEDD, United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 The question of whether insurance provides coverage for pollution damage is currently an important one that has far-reaching financial implications.[1] The answer determines who in the first instance bears the cost of pollution cleanup, although we recognize that it does not ultimately relieve the entire economy of the financial burden. In this case we conclude that certain insurance policies, interpreted in accordance with the law of New Jersey, do not provide coverage for the unintended environmental damage which allegedly continues to arise from the past regular surface disposal in a landfill of the waste products of a standard manufacturing process. We therefore affirm the judgment of the district court.
 
 
 2
 * Triangle Industries, Inc., and its subsidiary, Triangle PWC, Inc., (collectively referred to as "Triangle") were involved in the fabrication of wire and cable at a processing plant in Glen Dale, West Virginia. As part of the fabrication process, Triangle utilized a method of "pickling" the steel used to make its wires and cables which produced a waste product known as "lime-stabilized waste pickle liquor sludge." Between November 1977 and October 1980, this limestabilized waste pickle liquor sludge was trucked by an independent contractor from the Triangle plant in West Virginia to a landfill near St. Clairsville, Ohio, where it was poured onto the ground.[2] Shortly after Triangle ceased disposing of the sludge at the site, the Ohio Environmental Protection Agency conducted tests and discovered that hazardous materials were leaking from the landfill.
 
 
 3
 After conducting some of its own tests, on December 7, 1984, the United States Environmental Protection Agency notified Triangle, as well as other companies, that it considered them "potentially responsible parties" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 et seq. (1988). On October 3, 1985, Triangle and the other potentially responsible parties entered into an administrative consent agreement with the federal agency, in which the companies agreed to begin cleaning up the site.
 
 
 4
 From January 1, 1981, to April 4, 1987, Triangle maintained a number of insurance policies with three different insurers. All of the policies include covenants to defend and indemnify Triangle against covered property damage, but each policy also expressly excludes coverage for certain categories of pollution damage.
 
 
 5
 While the particular language of specific policies will be discussed later in some detail, it is useful to note at this point that this case involves, generally, three categories of insurance coverage. First, there are comprehensive general liability policies which contain what will be termed the "original" pollution exclusion clause. One of these policies, issued by Ideal Mutual Insurance Company, covered the years 1981 and 1982. The other, issued by Liberty Mutual Insurance Company, covered the period from January 1, 1982, to July 1, 1982. Second, there are comprehensive general liability policies with a "modified" pollution exclusion clause. Liberty Mutual issued policies of this type to Triangle, covering the period from July 1, 1982, to January 1, 1984. Afterwards, Zurich Insurance Company issued such policies covering the period from January 1, 1984, to April 1, 1987. Third, Zurich issued to Triangle a "claims-made" pollution liability insurance policy with a clause excluding certain sites, which covered the period from May 15, 1984, to May 15, 1985.
 
 
 6
 On March 7, 1985, Triangle notified all of its insurers that it had been named a potentially responsible party and asked that they bear Triangle's investigatory and legal expenses, furnish Triangle a defense in its attempt to avoid or minimize, through litigation, the requirement of paying for the extensive environmental cleanup, and indemnify Triangle for actual cleanup costs. Of course, Triangle conceded "a reservation of rights by the carriers as to their ultimate responsibilities for indemnification." Because Ideal Mutual was in receivership, the receiver, New Jersey Property-Liability Guaranty Association, responded to Triangle, denying coverage under the policy with Ideal Mutual. Zurich responded on April 1, 1985, explaining that it questioned whether the pollution damage in Ohio was covered by its policies, but would handle "this matter under a full and complete reservation of rights." However, on August 28, 1985, Zurich withdrew its participation in Triangle's defense, effective October 1, 1985. Liberty Mutual responded on February 27, 1986, after Triangle sent them a second letter, agreeing to participate in Triangle's defense despite reservations regarding indemnity. Liberty Mutual continued to assist in Triangle's defense until February 1, 1988, when Liberty Mutual concluded that Triangle was not covered by any of its policies and so too withdrew its defense.
 
 
 7
 Shortly thereafter, Liberty Mutual brought this diversity action, asking for a declaratory judgment that it owes no duty to defend Triangle. Triangle asserted counterclaims and third-party claims against the other insurers, seeking a declaration that a defense is owed.
 
 
 8
 The district court certified legal questions to the West Virginia Supreme Court of Appeals, which replied that, under West Virginia's choice-of-law rules, New Jersey law governs the interpretation of all of the insurance contracts. Subsequently, on cross motions for summary judgment, the district court held that although the environmental damage allegedly caused by dumping Triangle's sludge into the Ohio landfill was neither intended nor expected by Triangle, none of the insurance policies covered such damages by reason of pollution exclusions. 765 F.Supp. 881. This appeal followed.
 
 II
 
 9
 Before beginning our analysis of the various insurance policies which are at issue in this appeal, we note that a federal court sitting in diversity has a duty to apply the operative state law as would the highest court of the state in which the suit was brought. Having certified the question to the highest court of West Virginia and thereby determined that the law of New Jersey governs the construction of each of Triangle's insurance contracts, it was the duty of the district court, as it is ours, to interpret these instruments as would the New Jersey Supreme Court. See Brendle v. General Tire & Rubber Co., 505 F.2d 243, 245 (4th Cir.1974).
 
 
 10
 The best evidence to this effect would be, of course, a decision by the highest court of New Jersey which addresses the contract interpretation issues now before us, but that court has not spoken to many of these questions. In such circumstances, the state's intermediate appellate court decisions "constitute the next best indicia of what state law is," although such decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper Federal Practice & Procedure § 4507, at 94-95 (1982). See also West v. American Tel. & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940). In predicting a decision of the state's highest court we can further consider, among other things, canons of construction, restatements of the law and treatises that are regularly applied by the courts of the state and whose use for a particular purpose is approved by the state's highest court, see Fried v. North River Ins. Co., 710 F.2d 1022, 1025 (4th Cir.1983), and General Elec. Co. v. Sargent & Lundy, 916 F.2d 1119, 1125 (6th Cir.1990), recent pronouncements of general rules or policies by the state's highest court, see Woodruff v. Tomlin, 616 F.2d 924, 930 (6th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980), or even that court's well considered dicta, see 19 Wright, Miller & Cooper, supra, at 97. Decisions of the state's trial courts may also be considered to provide some light upon the subject. See id. at 96.
 
 
 11
 Finally, we note that the determination of state law by the district court is to be reviewed by us de novo. See Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).
 
 III
 
 12
 We begin our analysis of the insurance contracts at issue in this case with the comprehensive liability policies which include what we term the "original" pollution exclusion. Under these policies, which were issued to Triangle in 1981 and 1982 by Ideal Mutual and Liberty Mutual, insurance coverage is predicated upon the happening of an "occurrence," defined as
 
 
 13
 an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured.
 
 
 14
 (Emphasis added.) The district court found, and neither party disputes, that the environmental damage allegedly caused by the disposal of Triangle's waste materials was unexpected. Thus the case is placed within the basic coverage of the comprehensive liability policies.
 
 
 15
 However, these comprehensive liability policies include a standard exclusion for damage caused by certain forms of pollution. This "original" pollution exclusion removes from coverageproperty damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
 
 
 16
 (Emphasis added.) Once again, for purposes of this appeal there is no dispute that the environmental damage in this case arose from the discharge of pollutants upon the land, bringing this case within the initial precepts of the exclusion. The critical issue before us thus is whether the exception to the exclusion also applies, i.e., was "such discharge ... sudden and accidental"?
 
 
 17
 Triangle argues that the New Jersey lower court opinions require us to read the "sudden and accidental" language in the exclusion as applying to the pollution damage rather than to the discharge, dispersal, release or escape of the contaminant. While there are appellate court decisions in New Jersey that support such a view, see, e.g., Broadwell Realty Servs., Inc. v. Fidelity & Casualty Co., 218 N.J.Super. 516, 528 A.2d 76, 85 (App.Div.1987), we are firmly persuaded that the highest court of New Jersey would not concur with these opinions. First, the plain language of the policy makes clear that the "exclusion does not apply if such discharge, dispersal, release or escape [as distinct from the damage caused] is sudden and accidental." While New Jersey law reads ambiguities in favor of the insured, it does not "write for the insured a better policy of insurance than the one purchased." Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 562 A.2d 208, 214 (1989). Furthermore, given that the basic coverage of these policies is afforded for an occurrence defined as a condition giving rise to unintended damages, a reading of the subsequent language which excludes from the basic coverage all releases of pollution except those which cause unintended damages simply restates the basic coverage and writes the pollution exclusion completely out of the contract. See Jackson Township Mun. Utils. Auth. v. Hartford Accident & Indem. Co., 186 N.J.Super. 156, 451 A.2d 990, 994 (Law Div.1982) ("[T]he clause can be interpreted as simply a restatement of the definition of 'occurrence.' "). This construction violates a fundamental and longstanding principle that, where possible, meaning will be given to all of the clauses of an insurance policy. See Smith v. Fidelity & Deposit Co., 98 N.J.L. 534, 120 A. 322, 323 (Err. & App.1923). As New Jersey's highest court stated in Prather v. American Motorists Ins. Co., 2 N.J. 496, 67 A.2d 135, 138 (1949), "Effect, if possible, will be given to all parts of the instrument, and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable."
 
 
 18
 Finally, at least one opinion on which the Broadwell court appears to have relied in making its conclusion that the "sudden and accidental" language refers to the damages rather than the discharge of pollutants, see Broadwell, 528 A.2d at 83, in fact focused on whether the discharge of the pollutant was intended, rather than on the injury resulting from the discharge. See Lansco, Inc. v. Dep't of Envtl. Protection, 138 N.J.Super. 275, 350 A.2d 520, 524 (Ch.1975) ("[S]ince the spill was neither expected nor intended ... it follows that the oil spill was sudden and accidental under the exclusion clause...."), aff'd 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976) (per curiam). Thus we believe that the Supreme Court of New Jersey would conclude from the language of these policies that (1) basic coverage arises from the occurrence of unintended damages; but (2) such damages as arise from the discharge of various pollutants are excluded from this basic coverage; except that (3) damages arising from the discharge of these pollutants will fall within the coverage of these policies where such discharge is sudden and accidental.
 
 
 19
 To apply this construction to the facts of this case, we ask initially whether the discharge of the toxic sludge upon the ground at the landfill in St. Clairsville, Ohio, was an act expected or intended by Triangle. If so, the discharge could not be "accidental," and the resulting damage, even though unintended, would be excluded from coverage under the language of the pollution exclusion.
 
 
 20
 While Triangle points to a substantial quantity of evidence which tends to support the fact that Triangle did not know of the harm that would be caused by dumping its waste products at the Ohio landfill, no evidence was presented to the court below to demonstrate that Triangle did not expect and intend its sludge to be dumped upon the ground at the landfill. The sludge was a normal by-product of Triangle's manufacturing operation. The company hired trucks to haul the waste to the Ohio landfill. And Triangle corresponded with persons at the landfill, discussing the liquidity of the semi-solid sludge being dumped at the fill. Given this, we agree with the district court that the open dumping of a sludge onto the ground, particularly when performed as part of a regular business activity, cannot be considered an accidental discharge of the contaminant. Under the law of New Jersey, we therefore conclude that the losses sustained by reason of such an operation are not covered by the Liberty Mutual and Ideal Mutual comprehensive general liability policies containing the original pollution exclusion (with the "sudden and accidental" language).
 
 IV
 
 21
 We next address the comprehensive general liability policies, issued by Liberty Mutual and Zurich, which contain what we term the "modified" pollution exclusion language. As was the case with the policies containing the "original" pollution exclusion, basic coverage under the policies with the "modified" pollution exclusion is not questioned. As before, the issue on appeal is whether the pollution exclusion language removes the damages arising in this case from the coverage of these policies.
 
 
 22
 The modified language excludes coverage for property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply to bodily injury or property damage included within the product hazard or the completed operations hazard if the discharge, dispersal, release, or escape originates away from premises owned by, rented or loaned to a named insured.
 
 
 23
 (Emphasis added.) These terms make clear that all releases of pollutants are excluded from the coverage of these policies unless such releases are included within the "product hazard" or the "completed operations hazard" which is covered by the policy.
 
 
 24
 The term "product hazard" is a standard one in the insurance industry. Liability insurance policies are often issued "to protect the producer or manufacturer of goods against loss or injury to the person or property of others caused by the use of his products." 11 Couch on Insurance, 2d § 44:387 (2d ed. 1982). The "product hazard" language reflects an attempt to describe that protection. See CPS Chem. Co. v. Continental Ins. Co., 199 N.J.Super. 558, 489 A.2d 1265, 1270 (Law Div.1984), rev'd on other grounds, 203 N.J.Super. 15, 495 A.2d 886 (App.Div.1985). Likewise, the term "completed operations hazard" refers to an analogous form of protection offered for the benefit of those policyholders who provide a service in addition to or instead of a particular product. See id. ("Commentators are in complete agreement that this exclusion refers to accidents caused by defective workmanship which arise after completion of work by the insured on construction or service contracts.") (citing 58 A.L.R.3d § 2(a)).
 
 
 25
 The district court had little trouble concluding that the property damage in this case, which allegedly resulted from the disposal of a manufacturing waste product, involved neither a service operation nor a product of Triangle. We agree. The court noted in CPS Chem. Co. that "[the disposal of manufacturing wastes] does not involve construction or service operations" and "[i]ndustrial wastes not intended for consumption, sale, or use by others are not 'products.' " 489 A.2d at 1270. We find this reasoning to be sound and so conclude that the pollution damages which arose in this case also are not covered by the language of these policies containing the modified pollution exclusion.
 
 V
 
 26
 Zurich also issued to Triangle, in May 1984, a third type of insurance policy, a "claims-made" pollution liability insurance policy which contained a clause excluding the pollution arising from certain physical sites. These policies obligate Zurich to indemnify Triangle for property damage claims made during the policy period which result from the
 
 
 27
 emission, discharge, release, or escape of any solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants directly from the insured site into or upon the land.
 
 
 28
 The policy goes further to define the term "insured site" as
 
 
 29
 1) the specific location or part thereof specified as such in the declarations of this policy, or 2) any site to which waste materials were legally consigned or delivered by a named insured for storage, disposal, processing, or treatment, provided that the site ... was duly authorized for such storage, disposal, processing, or treatment under a permit issued by state or federal authority and in force at the time of all such consignment or delivery.
 
 
 30
 (Emphasis changed.) No contention is made in this case that the Ohio landfill was specifically identified as an insured site in the Zurich policies. Thus, the alleged damages resulting from the release of pollutants from the landfill can only be covered by the policy if "the site ... was duly authorized for such storage, disposal, processing, or treatment under a permit issued by state or federal authority."
 
 
 31
 Triangle does not seriously argue that it presented to the district court any evidence upon which a reasonable fact finder could conclude that the Ohio landfill was authorized to store its sludge by the state of Ohio or the federal government. Indeed the record reflects that in 1979 the Ohio Environmental Protection Agency expressly denied requests to allow the dumping of any sludge at the landfill, such requests having been made by the county in which the landfill was located. The state agency concluded:
 
 
 32
 No liquids, semi-solids (sludges) or hazardous waste can be approved for landfilling or disposal.... The site is considered very permeable and would not secure fluids contained in the waste.
 
 
 33
 In an effort to avoid the inevitable conclusion that the state of Ohio did not approve the landfill for storage of Triangle's sludge, Triangle now argues that the state was preempted by federal environmental regulations from regulating the disposal of nontoxic wastes at the state's landfills. That the Supreme Court has declared that a state "has every right to [protect its residents' pocketbooks as well as their environment] by slowing the flow of all waste into the State's remaining landfills" so long as it does not specifically discriminate against articles of commerce from outside the state, readily disposes of this argument as well. See City of Philadelphia v. New Jersey, 437 U.S. 617, 626-27, 98 S.Ct. 2531, 2536-37, 57 L.Ed.2d 475 (1978). Because the landfill was not approved for storage or disposal of Triangle's waste, we conclude that the district court was also correct in denying coverage under the Zurich claims-made policy.
 
 VI
 
 34
 Finally, we address the argument by Triangle that Liberty Mutual and Zurich should be estopped from denying their duty to defend Triangle in this toxic waste litigation. Triangle relies primarily upon the holdings of Battista v. Western World Ins. Co., Inc., 227 N.J.Super. 135, 545 A.2d 841 (Law Div.1988), aff'd in part and rev'd in part on other grounds sub. nom., Battista v. Olson, 250 N.J.Super. 330, 594 A.2d 260 (App.Div.1991), and Merchants Indem. Corp. v. Eggleston, 37 N.J. 114, 179 A.2d 505 (1962). However, neither of these cases substantially supports Triangle's contention.
 
 
 35
 In Battista the court concluded that a defense by an insurance company with a reservation of right to disclaim coverage for general damages precluded the insurance company from disclaiming coverage for punitive damages after a loss at trial. Battista, 545 A.2d at 845-46. Likewise, in Eggleston, the New Jersey Supreme Court stated that an insurer can be estopped from raising its defense to indemnification by conducting the insured's legal defense. Eggleston, 179 A.2d at 512-13 (dictum).
 
 
 36
 Unlike the cases upon which Triangle attempts to rely, neither Zurich nor Liberty Mutual defended Triangle until its liability was conclusively established at trial. On the contrary, both insurance companies agreed initially to defend Triangle (with a complete reservation of rights under the policies) because the policies, as interpreted by New Jersey law, require them to do so. See Mt. Hope Inn v. The Travelers Indem. Co., 157 N.J.Super. 431, 384 A.2d 1159, 1162, 1164 (Law Div.1978). After further review of the situation and their policies (and well before any trial on the issue of Triangle's liability) the insurance companies concluded that they had no duty to indemnify Triangle for the damage resulting from the sludge dumped at the Ohio landfill. Because "the duty to defend extends only to claims on which there would be a duty to indemnify in the event of a judgment adverse to the insured," see Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co., 98 N.J. 18, 483 A.2d 402, 405 (1984) (per curiam), Zurich and Liberty Mutual withdrew their defense of Triangle. See also Burd v. Sussex Mutual Ins. Co., 56 N.J. 383, 267 A.2d 7, 10 (1970) (noting that a covenant to defend does not oblige a carrier to "defend claims which would be beyond the covenant to pay if the claimant prevailed").
 
 
 37
 There may exist a point before the actual rendering of a verdict against the insured at which the New Jersey courts will consider that, despite a prior reservation as to coverage, the withdrawal from the defense of the insured (because of a determination that coverage does not exist or for other reasons) causes such harm to the insured that the insurer will be estopped from doing so. We are not convinced, however, that such a point arises in this case. The district court noted that "there is no evidence that the actions of Liberty or Zurich prejudiced Triangle by leaving it defenseless or seriously hampered its ability to protect itself so as to warrant estoppel." And Triangle admitted as much at oral argument when it conceded that the only prejudice to Triangle resulting from Liberty Mutual and Zurich's withdrawal from its defense was the loss of their assistance in the on-going litigation. That being the case, there are no grounds for estoppel, see Eggleston, 179 A.2d at 512 ("undoubtedly prejudice is an essential ingredient") (dictum), and in light of our decision with regard to the coverage of the insurance policies in question, Liberty Mutual and Zurich had every right to withdraw their legal assistance.
 
 VII
 
 38
 In summary, because the discharge of sludge upon the ground at the Ohio landfill was intended as the standard course of Triangle's business and was not "accidental," policies containing the "original" pollution exclusion for "sudden and accidental" releases of pollutants do not provide coverage, even though the damage caused by the discharge was unintended. Also, because the damage arising from wastes produced in a manufacturing process are included in neither a "product hazard" nor a "completed operations hazard" under New Jersey law, policies containing the "modified" pollution exclusion do not provide coverage. Finally, because Triangle produced no evidence that the landfill in which its sludge was placed was approved for the storage of such sludge by the state of Ohio or the federal government, the "claims made" policy does not provide coverage for damage caused by the sludge. Triangle's alternative argument that there is coverage-by-estoppel is also rejected in the circumstances of this case, and accordingly the decision of the district court is affirmed.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 In this regard, we received amicus curiae briefs from Insurance Environmental Litigation Association on behalf of 19 insurance companies and from Westinghouse Electric Corporation, International Business Machines Corporation, Olin Corporation, American Fiber Manufacturers Association, American Petroleum Institute, and Chemical Manufacturers Association
 
 
 [2]
 We can suppose that in that lime-stabilized waste pickle liquor sludge "the slithy toves [d]id gyre and gimble." See Lewis Carroll, "Jabberwocky," from Through the Looking Glass, Ch. 1 (1872)